NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1255-18T3

TRACEY L. VIZZONI, as
Executrix For The Estate Of
Judith A. Schrope,

       Plaintiff-Appellant,

v.

B.M.D., J.D., and ATLOCK FARM,

       Defendants,

and

STEFAN LERNER,

       Defendant-Respondent.

_____

| APPROVED FOR PUBLICATION |
| --- |
| June 24, 2019 |
| APPELLATE DIVISION |

Argued March 28, 2019 – Decided June 24, 2019

Before Judges Simonelli, Whipple and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-0575-15.

Justin Lee Klein argued the cause for appellant (Hobbie, Corrigan & DeCarlo, PC, attorneys; Jacqueline DeCarlo, of counsel; Justin Lee Klein, on the briefs).

Sam Rosenberg argued the cause for respondent (Rosenberg Jacobs Heller & Fleming, PC, attorneys; Sam Rosenberg, of counsel; Matthew E. Blackman, on the brief).

Shook, Hardy & Bacon LLP, attorneys for amici curiae American Medical Association and Medical Society of New Jersey (Philip S. Goldberg, on the brief).

The opinion of the court was delivered by

WHIPPLE, J.A.D.

Plaintiff Tracey L. Vizzoni, as executrix for the estate of Judith A. Schrope, appeals from a May 11, 2018 Law Division order granting summary judgment and dismissing her negligence claims against defendant Stefan Lerner, M.D.[1]  Tragically, Lerner's patient, B.M.D.,[2] struck and killed Judith Schrope while driving.  Plaintiff argues Lerner's negligent prescription of medication to B.M.D. was the proximate cause of the fatal crash.  For the reasons that follow, we affirm the order of the trial court.

---

[1] Stefan Lerner, M.D. was improperly pled as Stefan Lerner.

[2] Due to the confidential medical information in the record, we use initials for B.M.D. and J.D. to protect their privacy.

I.

We discern the following facts from the record and view them in the light most favorable to plaintiff. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). On June 17, 2014, at around 9:45 in the morning, B.M.D., driving her SUV, struck decedent Schrope as Schrope was riding her bicycle on the right-hand side of a residential road. B.M.D. approached Schrope from behind and saw her in the distance. Visibility was clear and there were no cars approaching from the other direction. At the scene of the accident, B.M.D. gave a recorded statement to police. The officer conducting the interview asked B.M.D. if she was being treated for any medical conditions, and she responded "mild depression." She reported to the officer she had taken Paxil that day and had a glass of wine the prior evening. There is no evidence in the record that the police conducted a field sobriety check. The police did not request a blood draw or an Alcotest. A police report concluded, "[B.M.D.] made no attempt to move over to the left and safely pass Mrs. Schrope. [Even though] [t]he width of the roadway was measured [twenty] feet [nine] inches[,] which would have allowed ample space for [B.M.D.] to move over and safely pass Mrs. Schrope." Despite the fact that Schrope suffered fatal injuries, B.M.D. was only charged with and convicted of careless driving, N.J.S.A. 39:4-97, after a trial in municipal court.

On May 4, 2015, plaintiff filed a wrongful death and survivorship claim against B.M.D.[3] Through discovery, plaintiff learned B.M.D. was under the care of psychiatrist Stefan Lerner, M.D, and plaintiff named him as a defendant in a first amended complaint. During B.M.D.'s deposition, she was asked about what medications she took. At the time of the crash, B.M.D. was prescribed at least six psychiatric medications, including: (1) duloxetine (Cymbalta); (2) lamotrigine (Lamictal); (3) lithium carbonate (Lithobid); (4) trazadone; (5) dexmethylphenidate hydrochloride (Focalin); and (6) methylphenidate (Concerta). B.M.D. admitted she took duloxetine, lamotrigine and lithium carbonate on the morning of the crash. When asked if she took trazodone the night before the crash, she testified she did not know, and, when asked if it was possible, she answered "it's possible." She also consumed some wine the night before. B.M.D. also testified she did not experience side effects from her medications except for Focalin.

Focalin is a central nervous system stimulant used to treat Attention Deficit Disorder (ADD) and Attention Deficit Hyperactivity Disorder (ADHD). B.M.D. admitted Focalin made her "feel a little speedy" as if she was "on speed." She initially denied taking Focalin on the day of the crash

---

[3] Plaintiff also named B.M.D.'s husband J.D., who owned the car, and Atlock Farm, B.M.D.'s employer. Both were dismissed in an order for summary judgment that is not before us.

because "[i]t had such bad ramifications, I didn't want to bring it up," but later admitted it was possible she "took half of the dose I should have."

On June 8, 2014, Lerner mailed B.M.D. a prescription for Concerta without meeting with her in person. Concerta is also a central nervous system stimulant. B.M.D. testified she did not complain to Lerner of any adverse reaction to Focalin, and Lerner did not document why he wrote her a new prescription. In her deposition, B.M.D. could not recall whether she took either one, neither or both Focalin and Concerta on the morning of the crash.

Lerner began working with B.M.D. in 2001. Over the course of thirteen years, up and until the crash, he wrote her 160 initial prescriptions and over 250 refill prescriptions. Lerner diagnosed B.M.D. with Major Depressive Disorder, ADD and panic disorder but not bi-polar disorder, although he opined she exhibited bi-polar-like symptoms. During her testimony, B.M.D. exhibited limited knowledge about the purpose and effect of each drug she was prescribed and admitted she often altered dosages without consulting Lerner. She denied Lerner ever warned her against driving after ingesting her medication. However, Lerner testified he would have warned her, especially if she felt drowsy or light-headed.

B.M.D. sometimes missed her appointments with Lerner. Lerner explained this was problematic because he did not want to alter B.M.D.'s

medication regimen and recognized the importance of meeting with her in person to determine how she was responding to the medication. Lerner acknowledged he sometimes mailed prescriptions to B.M.D. without meeting with her in person and admitted to mailing her a prescription for Concerta on June 8, 2014. Prior to the crash, B.M.D.'s last meeting with Lerner was April 3, 2014.

Several years before the accident, B.M.D. told Lerner she had panic attacks that either occurred while she was driving or left her feeling like she could not drive. She reported experiencing one panic attack while driving so severe that she had to pull over. Lerner was aware B.M.D. experienced panic attacks while driving but was under the impression "she has [not] had much trouble in that area" because she continued to drive without incident.

Although plaintiff's complaint names B.M.D.'s pharmacist as "John/Jane Doe Doctors/Pharmacists," the record lacks any mention of who filled B.M.D.'s prescriptions. Of particular significance is the absence of any record or testimony about whether B.M.D.'s pharmacist provided written or oral warnings of the potential side effects of the medications. No pharmacy records are included in the appellate record.

Lerner moved for summary judgment on March 27, 2018. Lerner argued he owed no duty of care to Schrope because she was not a readily identifiable

victim. Lerner argued a therapist has no duty to warn unless he or she knows or should know their patient intends to harm a readily identifiable victim.

Plaintiff opposed Lerner's motion and submitted the report of two experts. Robert J. Pandina, Ph.D., opined B.M.D.'s ability to operate a motor vehicle was impaired when she struck Schrope.[4] Pandina explained the purpose and possible side effects of each of the medications B.M.D. was prescribed as follows:

> a. Duloxetine (Cymbalta) is an anti-depression medication prescribed for major depression; it has a half-life of [twelve] to [seventeen] hours, which is relatively long for such medications. To be effective the medication should be taken daily and requires a buildup period for efficacy. Given the long half-life the potential exists for a buildup of the drug that increases the risk of side effects hence careful monitoring of the medication is advisable as is close observation of the patient response to the medication. Side effects include: fatigue; drowsiness and sedation; double vision; crossed eyes; blurred vision; dizziness and lack of coordination; [i]nsomnia; impulsivity; anxiety; vivid dreams or nightmares; dry mouth, mouth ulcers; memory problems; mood changes; itchiness; runny nose; cough; and nausea. Use may also trigger panic attacks. Some patients have reported experiencing a loss of concentration, even

---

[4] In reviewing Pandina's opinion, we note the documents that formed the basis of his opinion included municipal court transcripts. Our record only included the portion of the transcript containing the municipal court judge's decision after a two day hearing. We asked for the complete transcripts, and they were provided.

with very small doses.  Women are more likely than men to have side-effects.

b. Lamotrigine (Lamictal) is prescribed for seizure disorders.  On-set of effect ranges from 1.4 to 4.8 hours.  It has a half-life of [twenty-nine] hours, which is relatively long for such medications.  As is the case with [duloxetine (Cymbalta)] [due to] the long half-life the potential exists for a buildup of the drug that increases the risk of side effects hence careful monitoring of the medication is advisable as is close observation of the patient response to the medication.  Lamotrigine is also an indicated medication option for the treatment of bipolar disorders.  However, many clinicians also use it in patients with a (unipolar) depressive disorder who have not responded adequately to conventional antidepressants.  Such usage would be considered "off label."  Side effects are similar to those of [d]uloxetine (Cymbalta) and include: tremors, dizziness; tired feeling; blurred vision, double vision; loss of coordination; sleep problems.  Given the risk of side effects patients should be carefully monitored specifically when the medication is given along with other anti-depressants.

c. Lithium carbonate (Lithobid) is prescribed principally for bi-polar depression.  It may be used in cases where other forms of medications are not effective.  In some case[s] of apparent major depression with fewer manic than depressive symptoms the drug may be used as an adjunctive therapy.  Side effects include loss of balance or coordination, drowsiness or muscle weakness; hand tremors; confusion; memory problems; lack of awareness; blurred vision.  Prescription of this medication requires frequent monitoring of blood to assure levels are within frequent therapeutic limits.

d. Trazadone is a medication used in the treatment of major depression.  It may also be prescribed as a sleep

8

aid. The medication has a bi-phasic half-life. The first phase ranges between [three] to [six] hours; subsequent phase range[s] between [five] and [nine] hours. Initial effectiveness occurs approximately one hour post ingestion. Side effects include: drowsiness and sedation; dizziness or loss of balance; confusion; blurred vision; impairment of vigilance. Alcohol use will increase risk of sedation and other side effects.

e. [Dexmethylphenidate hydrochloride (Focalin)] is a central nervous system (CNS) stimulant employed in treatment of ADD and [ADHD]. Side effects include: blurred vision; dizziness; drowsiness; agitation; heart palpitations. Special care should be taken in using stimulants to treat ADD and ADHD in patients with comorbid bipolar disorder. The concern stems from the potential for possible induction of a mixed/manic episode in such patients. Before initiating treatment with a stimulant, patients with comorbid depressive symptoms should be adequately screened to determine if they are at risk for bipolar disorder. Prescription of these medications is contra-indicated for such individuals.

f. [Methylphenidate (Concerta)[5]] is a [CNS] stimulant employed in treatment of ADD and [ADHD]. Side effects include: blurred vision; dizziness; drowsiness; agitation; heart palpitations. Special care should be taken in using stimulants to treat ADD and ADHD in patients with comorbid bipolar disorder. The concern stems from the potential for possible induction of a mixed/manic episode in such patients. Before initiating treatment with a stimulant, patients with comorbid depressive symptoms should be adequately screened to determine if they are at risk for bipolar

---

[5] Both Focalin and Concerta are designated as Schedule II controlled dangerous substances by the federal government. 21 C.F.R. § 1308.12(d).

A-1255-18T3

disorder. Prescription of these medications is contra-indicated for such individuals.

Plaintiff's second expert, Alberto M. Goldwaser, M.D., opined Lerner's treatment of B.M.D. "fell outside the acceptable professional standards of care as they apply to the practice of neuropsychiatry/psychiatry, and such deviation was a significant contributing factor in causing the motor vehicle collision . . . [that] resulted in the death of Ms. Judith Schrope." Goldwaser criticized Lerner for prescribing medication without an accompanying diagnosis and then prescribing additional medication to counteract negative side effects. Instead, Goldwaser opined Lerner should have treated B.M.D.'s underlying mental health issues rather than only treat her symptoms.

On May 11, 2018, after oral argument, the trial judge agreed with Lerner that because there was no connection between Lerner and Schrope, Lerner did not owe her a duty of care. The trial judge noted that many substances could render a driver sleepy and "all of them are clearly marked with those kinds of warning[s]." The judge also stated the record did not establish "that [] [B.M.D.] was drunk or intoxicated." Thus, the trial judge granted Lerner's motion for summary judgment.

Plaintiff moved for leave to appeal, which we denied. The Supreme Court granted plaintiff's motion for leave to appeal and summarily remanded the case to us to review the May 11, 2018 order on the merits. On January 16,

10

2019, the American Medical Association and the Medical Society of New Jersey moved for leave to appear as amici curiae. Pursuant to Rule 1:13-9(a), we granted amici leave to file a brief.

On appeal, plaintiff argues New Jersey law is ripe for an extension of a prescribing practitioner's duty of care and urges us to adopt the reasoning from other jurisdictions that a prescribing practitioner owes a duty to warn their patient of adverse side effects of medications for the benefit of third parties. For the reasons that follow, we decline to do so.

## II.

"[W]e review the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The evidence must be viewed "in the light most favorable to the non-moving party." Mem'l Props., LLC v. Zurich Am. Ins. Co., 210 N.J. 512, 524 (2012).

However, "Rule 4:46-2(c)'s 'genuine issue [of] material fact' standard mandates that the opposing party do more than 'point[] to any fact in dispute' in order to defeat summary judgment." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (alterations in original) (quoting Brill, 142 N.J. at 529). "[W]hether there exists a 'genuine issue' of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented . . . are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540. "To defeat a motion for summary judgment, the opponent must 'come forward with evidence that creates a genuine issue of material fact.'" Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012)). "[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion . . . ." Puder v. Buechel, 183 N.J. 428, 440-41 (2005).

"The motion court must analyze the record in light of the substantive standard and burden of proof that a factfinder would apply in the event that the case were tried." Globe Motor Co, 225 N.J. at 480. "Thus, 'neither the motion court nor an appellate court can ignore the elements of the cause of action or the evidential standard governing the cause of action.'" Id. at 480-81 (quoting

Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). We consider, as the trial judge did, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007) (quoting Brill, 142 N.J. at 536).

"If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We review issues of law de novo and accord no deference to the trial judge's legal conclusions. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

To sustain a cause of action for negligence, a plaintiff must establish four elements: "(1) [a] duty of care, (2) [a] breach of [that] duty, (3) proximate cause, and (4) actual damages[.]" Polzo v. Cty. of Essex, 196 N.J. 569, 584 (2008) (alterations in original) (quoting Weinberg v. Dinger, 106 N.J. 469, 484 (1987)). A "plaintiff bears the burden of establishing those elements 'by some competent proof[.]'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014) (citation omitted) (quoting Overby v. Union Laundry Co., 28 N.J. Super. 100, 104 (App. Div. 1953)). Proximate cause consists of "any cause

which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." Conklin v. Hannoch Weisman, 145 N.J. 395, 418 (1996) (quoting Fernandez v. Baruch, 96 N.J. Super. 125, 140 (App. Div. 1967), rev'd on other grounds, 52 N.J. 127 (1968)); Dawson v. Bunker Hill Plaza Assocs., 289 N.J. Super. 309, 322 (App. Div. 1996).

Determining the scope of tort liability presents a question of law. Kelly v. Gwinnell, 96 N.J. 538, 552 (1984). "The question of whether a duty to exercise reasonable care to avoid the risk of harm to another exists is one of fairness and policy that implicates many factors." Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 572 (1996). The inquiry "turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993). "The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct." Ibid.

"Foreseeability of the risk of harm is the foundational element in the determination of whether a duty exists." J.S. v. R.T.H., 155 N.J. 330, 337 (1998). "Foreseeability is significant in the assessment of a duty of care to

14

another; moreover, it has a dual role in the analysis of tort responsibility." Olivo v. Owens-Ill., Inc., 186 N.J. 394, 402 (2006). In the duty of care analysis, foreseeability "is based on the defendant's knowledge of the risk of injury and is susceptible to objective analysis." J.S., 155 N.J. at 338. That knowledge may arise from actual awareness, Carvalho, 143 N.J. at 576, or knowledge may be constructive when the defendant "was in a position to foresee and discover the risk of harm[.]" Id. at 578. "In some cases where the nature of the risk or the extent of harm is difficult to ascertain, foreseeability may require that the defendant" know a certain class of reasonably foreseeable persons would likely suffer injury. J.S., 155 N.J. at 338; see also C.W. v. Cooper Health Sys., 388 N.J. Super. 42, 62 (App. Div. 2006); Safer v. Estate of Pack, 291 N.J. Super. 619, 626-27 (App. Div. 1996). "Also included in the analysis is 'an assessment of the defendant's "responsibility for conditions creating the risk of harm" and an analysis of whether the defendant had sufficient control, opportunity, and ability to have avoided the risk of harm.'" Podias v. Mairs, 394 N.J. Super. 338, 350 (App. Div. 2007) (quoting J.S., 155 N.J. at 339).

"Once the foreseeability of an injured party is established, . . . considerations of fairness and policy govern whether the imposition of a duty is warranted." Carvalho, 143 N.J. at 573 (alteration in original) (quoting

15

Carter Lincoln-Mercury, Inc. v. EMAR Grp., Inc., Leasing Div., 135 N.J. 182, 194-95 (1994)).  The assessment of fairness and policy "involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution."  Hopkins, 132 N.J. at 439.

> Although in many cases a duty of care can arise simply from the determination of the foreseeability of harm, usually "more is needed" to find such a duty, that "'more' being the value judgment, based on an analysis of public policy, that the actor owed the injured party a duty of reasonable care."
>
> [Carvalho, 143 N.J. at 573 (quoting Kelly, 96 N.J. at 544).]

"Public policy must be determined in the context of contemporary circumstances and considerations."  J.S., 155 N.J. at 339.  "Thus, '"[d]uty" is not a rigid formalism' that remains static through time, but rather is a malleable concept that 'must of necessity adjust to the changing social relations and exigencies and man's relations to his fellows.'"  Ibid. (alteration in original) (quoting Wytupeck v. Camden, 25 N.J. 450, 462 (1957)).

New Jersey courts have recognized a mental-health professional owes a duty to take reasonable steps to protect a readily identifiable victim put at risk by their patient.  In McIntosh v. Milano, 168 N.J. Super. 466, 489 (Law. Div. 1979), the Superior Court held a therapist had a duty to protect a readily

identifiable victim who was murdered by his patient, because the therapist had reason to know his patient presented a danger to the victim.  McIntosh was decided in light of Tarasoff v. Regents of University of California, 551 P.2d 334, 353 (Cal. 1976), where the Supreme Court of California held a psychiatrist had a duty to protect a readily identifiable victim of his patient when the patient informed the psychiatrist of his intent to murder the victim.

Tarasoff recognized that while one has no duty to control the actions of another, a mental-health professional is often in the best position to determine "whether a patient presents a serious danger of violence." Id. at 345.  It was not necessary for the psychiatrist in Tarasoff to have prevented the harm, but rather, the psychiatrist should have exercised "that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances."  Ibid. (alteration in original) (quoting Bardessono v. Michels, 478 P.2d 480, 484 (Cal. 1970)).  In McIntosh, the Law Division observed that the therapist's duty arises from the special relationship between therapist and patient, and the duty is solidified when the therapist knows or should know the patient intends harm or as an extension of the healthcare professional's broad-based duty to protect the welfare of the community.  168 N.J. Super. at 489-90; see also Restatement (Second) of Torts § 315 (Am. Law Inst. 1965) ("There is no duty so to control

the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection.").  Prior to and since McIntosh, both New Jersey courts and our Legislature expanded the special relationship rule to include the duty to warn potential victims of contagious or genetic diseases.[6]

McIntosh led to the enactment of N.J.S.A. 2A:62A-16, which immunized licensed medical professionals "from any civil liability for a patient's violent act against another person or against himself unless the practitioner has incurred a duty to warn and protect the potential victim[.]"  N.J.S.A. 2A:62A-16(b) explains a duty to warn and protect arises if "[t]he patient has

---

[6]  For example, in Safer, the defendant-doctor knew his patient had a genetically transmissible form of cancer but failed to warn the patient's family members.  291 N.J. Super. at 623.  The doctor's failure to warn was a breach of his duty to the family members because they were a readily identifiable class of persons put at risk by the doctor's failure to act.  Id. at 625 ("We see no impediment, legal or otherwise, to recognizing a physician's duty to warn those known to be at risk of avoidable harm from a genetically transmissible condition.  In terms of foreseeability especially, there is no essential difference between the type of genetic threat at issue here and the menace of infection, contagion or a threat of physical harm.").  In C.W., the court applied a similar principle and held a physician who failed to warn his patient of a positive HIV test owed a duty to third parties threatened by his patient's health status.  388 N.J. Super. at 62.

communicated to that practitioner a threat of imminent, serious physical violence against a readily identifiable individual" or if "[t]he circumstances are such that a reasonable professional . . . would believe the patient intended to carry out an act of imminent, serious physical violence against a readily identifiable individual[.]"  In one instance, N.J.S.A. 2A:62A-16 was applied to immunize a psychiatrist who reasonably did not know his patient intended to commit suicide.  Marshall v. Klebanov, 188 N.J. 23, 40 (2006).[7]

Here, the trial court relied on McIntosh and the principle that unless the victim of a therapist's patient is readily identifiable, there is no duty to act for the victim's benefit.  The trial court concluded that because Lerner did not know Schrope and had no indication B.M.D. was going to harm her, Lerner did not owe Schrope a duty of care.  Although we affirm the trial court's dismissal of plaintiff's claims as a matter of law, we think reliance on McIntosh, and the principles therein, was misplaced.

---

[7] Health care professionals are subject to other statutory duties, such as: a duty to warn a patient about the addictive risks of opioids before prescribing them for pain management, N.J.S.A. 24:21-15.2(d); the duty to report a patient's diagnosis of certain communicable diseases to the Department of Health, N.J.S.A. 26:4-15; the duty to report a patient's history of convulsive seizures or periods of unconsciousness to the Division of Motor Vehicles, N.J.S.A. 39:3-10.4; and, in the case of a pharmacy permit holder, the duty to report information about each prescription for a controlled dangerous substance dispensed by the pharmacy, N.J.S.A. 45:1-45.

In cases analyzing the duty of care owed within the context of a special relationship, the principal question is whether the defendant had a duty to act for the benefit of another but failed to do so. See Podias, 394 N.J. Super. at 346 ("Traditional tort theory emphasizes individual liability, which is to say that each particular defendant who is to be charged with responsibility must be proceeding negligently. Ordinarily, then, mere presence at the commission of the wrong, or failure to object to it, is not enough to charge one with responsibility inasmuch as there is no duty to take affirmative steps to interfere."); McIntosh, 168 N.J. Super. at 483 (explaining that generally a person has no duty to control the actions of another except within the context of a special relationship). But here, Lerner acted affirmatively by prescribing medication to B.M.D. Thus, we must examine the legal consequences of Lerner's action.

The Restatement (Third) of Torts: Liability for Physical and Emotional Harm makes this same distinction. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 41 cmt. h (Am. Law Inst. 2005) (Restatement (Third) of Torts). Section 41 of the Restatement (Third) of Torts revised and replaced Restatement (Second) of Torts § 315, which provided the basis for the special relationship exception. See McIntosh, 168 N.J. Super. at 483 (citing Restatement (Second) of Torts § 315 for the proposition that generally a

person has no duty to control another's conduct unless a special relationship exists between the two); Restatement (Third) of Torts § 41 cmt. a ("This Section replaces §[] 315(a) . . . and includes an additional relationship creating an affirmative duty, that of mental health professional and patient."). Section 41 adopts a categorical approach and provides:

> (a) An actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by the other that arise within the scope of the relationship. (b) Special relationships giving rise to the duty . . . include: . . . (4) a mental-health professional with patients.
>
> [Restatement (Third) of Torts § 41.]

However, the comments to section 41 distinguish between scenarios where the practitioner is under an affirmative duty to act versus when the practitioner's conduct creates a foreseeable risk of harm. Id. cmt. h. When a practitioner prescribes either appropriate or inappropriate medication that impairs the patient, who in turn puts others at risk, the practitioner was under a duty to exercise reasonable care in making that decision. Ibid. ("In some cases, care provided to a patient may create risks to others. This may occur because of negligent treatment, such a prescribing an inappropriate medication that impairs the patient. It can also occur because of appropriate care of the patient, such as properly prescribing medication that impairs the patient."). Thus, the question is not whether the practitioner had a duty to act, but rather

were the consequences of the act of prescribing medication foreseeable to the practitioner. See ibid. ("In these instances, the physician's duty to third parties is governed by [Restatement (Third) of Torts] § 7, not by this Chapter."); see also Restatement (Third) of Torts § 7(a) ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.").

Here, the parties do not dispute Lerner had a duty to exercise reasonable care in his treatment of B.M.D. See, e.g., Komlodi v. Picciano, 217 N.J. 387, 410 (2014) ("A physician must exercise a duty of care to a patient that, generally, any similarly credentialed member of the profession would exercise in a like scenario."). Accordingly, the parties agree that B.M.D. may have a cause of action against Lerner premised on the patient-practitioner relationship. See, e.g., Verdicchio v. Ricca, 179 N.J. 1, 23 (2004) ("A medical malpractice case is a kind of tort action in which the traditional negligence elements are refined to reflect the professional setting of a physician-patient relationship."). It would defy logic to suggest that the duty of care Lerner owes B.M.D., within the patient-practitioner relationship, is somehow diminished because B.M.D. is not seeking to hold Lerner directly liable. Here, Lerner did have a duty to warn and educate B.M.D. about the side effects of the medications he prescribed. See In re Accutane Litig., 235 N.J. 229, 265-66

(2018) (describing the learned intermediary doctrine, which acknowledges the prescribing practitioner must deliver pharmaceutical warnings to patients as the intermediary between pharmaceutical manufacturers and consumers).  As a result, Lerner can only be held liable for the foreseeable consequences of his actions.

Thus, the issue in this case is properly framed as one of proximate cause, not the duty of care.  "[A] plaintiff must show that a defendant's conduct constituted a cause-in-fact of his injuries."  Dawson, 289 N.J. Super. at 322.  "In the routine tort case, 'the law requires proof that the result complained of probably would not have occurred "but for" the negligent conduct of the defendant.'"  Conklin, 145 N.J. at 417 (quoting Vuocolo v. Diamond Shamrock Chems. Co., 240 N.J. Super. 289, 295 (App. Div. 1990)).  "[A]n act or omission is not regarded as a cause-in-fact of an event if the event would have occurred without such act or omission."  Thorn v. Travel Care, Inc., 296 N.J. Super. 341, 346 (App. Div. 1997).  "[T]here may be multiple causes of an injury, [though] these causes 'need not, of themselves, be capable of producing the injury; it is enough if they are "a substantial factor" in bringing it about.'"  Id. at 347 (quoting Conklin, 145 N.J. at 419).

"Proximate cause has been described as a standard for limiting liability for the consequences of an act based 'upon mixed considerations of logic,

23                                                                    A-1255-18T3

common sense, justice, policy and precedent.'" <u>Fleuhr v. City of Cape May</u>, 159 N.J. 532, 543 (1999) (quoting <u>Caputzal v. Lindsay Co.</u>, 48 N.J. 69, 77-78 (1966)). "Proximate cause is a limitation the common law has placed on an actor's responsibility for the consequences of the actor's conduct." <u>Camp v. Jiffy Lube No. 114</u>, 309 N.J. Super. 305, 309 (App. Div. 1998). "As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability." <u>Brown v. U.S. Stove Co.</u>, 98 N.J. 155, 173 (1984) (quoting <u>Caputzal</u>, 48 N.J. at 78).

"Ordinarily, the issue of proximate cause should be determined by the factfinder." <u>Fleuhr</u>, 159 N.J. at 543. "Proximate cause as an issue, however, may be removed from the factfinder in the highly extraordinary case in which reasonable minds could not differ on whether that issue has been established." <u>Ibid.</u> "[O]ur courts have, as a matter of law, rejected the imposition of liability for highly extraordinary consequences." <u>J.S.</u>, 155 N.J. at 352. Our Supreme Court has explained

> to prove the element of causation, plaintiffs bear the burden to "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes

the duty of the court to direct a verdict for the defendant."

[Townsend v. Pierre, 221 N.J. 36, 60-61 (2015) (quoting Davidson v. Slater, 189 N.J. 166, 185 (2007)).]

See also Thorn, 296 N.J. Super. at 347 ("[A]lthough plaintiffs bear the burden of proving causation, 'they are not obliged to establish it by direct, indisputable evidence.' Instead, '[t]he matter may rest upon legitimate inference, so long as the proof will justify a reasonable and logical inference as distinguished from mere speculation.'" (quoting Kulas v. Pub. Serv. Elec. & Gas Co., 41 N.J. 311, 319 (1964))).

In Townsend, the Supreme Court held summary judgment was properly granted when the non-moving party failed to put forward any competent evidence to prove proximate cause. 221 N.J. at 61. Similarly, in Fleuhr, the Supreme Court reinstated a grant of summary judgment because dangerous ocean conditions and a surfer's negligence, not a lifeguard's conduct, caused the injury. 159 N.J. at 543-45. Proximate cause may also be removed from the jury's determination if causation depends on the validity of an expert's report. See Townsend, 221 N.J. at 57-58 (rejecting an expert's opinion on causation because it diverged from the evidence); Dawson, 289 N.J. Super. at 324 (holding that summary judgment was proper when an expert offered a net opinion of causation and the non-moving party could not make "a prima facie

showing of a causal relationship between [the injury] and [the] alleged negligent conduct"). "Thus, in the unusual setting in which no reasonable factfinder could find that the plaintiff has proven causation by a preponderance of the evidence, summary judgment may be granted dismissing the plaintiff's claim." Townsend, 221 N.J. at 60.

## III.

We liken this case to instances of social host liability and dram shop cases. In such scenarios there are really two actions that cause the injury: "A" provides alcoholic beverages to visibility intoxicated "B," and B injures "C," an innocent third party. Although A and B have no special relationship, A's negligent provision of alcohol to B was a proximate cause of C's injury. The thread connecting A to C is that A was, in part, responsible for B's intoxication, and B's intoxication caused C's injury. However, in our case, the common thread connecting Lerner to Schrope is missing: the record contains no evidence B.M.D. was impaired at the time she caused Schrope's fatal injuries.

Social host or tavern owner liability is tempered by the "visibly intoxicated" requirement. For example, in Kelly, social hosts provided a guest with "two or three drinks of scotch on the rocks" "an hour or two" before the guest was involved in a head-on collision. 96 N.J. at 541. An expert

A-1255-18T3

concluded that, at the time of the car crash, the guest had consumed "the equivalent of thirteen drinks" and "must have been showing unmistakable signs of intoxication" at the social hosts' home. Ibid. As a result, the social hosts had knowledge of the risk of harm the guest presented to other drivers and it was fair to hold the social hosts liable for providing the alcohol that caused the collision. Id. at 543-44 ("[O]ne could reasonably conclude that the [social hosts] must have known that their provision of liquor was causing [the guest] to become drunk, yet they continued to serve him even after he was visibly intoxicated. By the time [the guest] left, [he] was in fact severely intoxicated. A reasonable person in [the social hosts'] position could foresee quite clearly that this continued provision of alcohol to [the guest] was making it more and more likely that [the guest] would not be able to operate his car carefully.").

Under the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act, N.J.S.A. 2A:22A-1 to -7, and a comparable social host statute, N.J.S.A. 2A:15-5.6, a person injured by a patron or social guest may only recover from the server or social host if the patron or social guest was "visibly intoxicated." "'Visibly intoxicated' means a state of intoxication accompanied by a perceptible act or series of acts which present clear signs of intoxication." N.J.S.A. 2A:22A-3. Once a patron becomes visibly intoxicated, the social host

or server is imputed with the knowledge that the patron presents a risk of harm to others, and, as a result, it is fair to impose on the server or social host the consequences that reasonably flow from the decision to over-serve the patron. See Steele v. Kerrigan, 148 N.J. 1, 25-26 (1997) (explaining that social hosts know their visibly intoxicated guests cannot safely operate a motor vehicle and tavern owners are charged with "the more complete knowledge" of the harm an intoxicated patron could cause, such as fighting or motor vehicle accidents).

Of course, the injured party must affirmatively prove the patron or social guest was intoxicated when the injury was caused. In Halvorsen v. Villamil, 429 N.J. Super. 568, 573 (App. Div. 2013), no eyewitness was available to testify a tavern served alcohol to a visibly intoxicated patron. However, that was not fatal to the injured party's claim; rather, intoxication "may be proved by both direct evidence and circumstantial evidence." Id. at 575. The plaintiff presented evidence the patron had just left a restaurant, was driving erratically, struck a slowing vehicle hard enough to cause it to flip, a police officer smelled alcohol on his breath and he had a substantial blood-alcohol content. Id. at 576-77. The plaintiff's expert used this information to opine that it was likely the patron was visibly intoxicated while at the tavern. Id. at 577. We explained that the expert report alone was insufficient to create a genuine issue of material fact on the visible intoxication issue. Id. at 579. Instead, it was all

the evidence of the patron's behavior before and after the crash that allowed a reasonable jury to infer the tavern served the patron while he was visibly intoxicated. Ibid.

Similarly, here, plaintiff must make a prima facie showing that the crash was caused by B.M.D.'s impairment. Based on our review of the record, we agree with the trial court's finding that B.M.D. was not impaired or intoxicated at the time of the crash. Plaintiff's expert reports to the contrary are based on conclusory statements untethered to the observations of the police officers who interviewed B.M.D. at the scene. In our view, plaintiff's proofs of proximate cause amount to "pure speculation or conjecture" and would force the jury to hypothesize on whether B.M.D. was impaired.

Goldwaser and Pandina opined that the medication B.M.D. took on the day of the crash compromised her ability to drive. Both experts based their opinion on: court records, B.M.D.'s and Lerner's deposition testimony, Lerner's treatment records, pharmacy and laboratory records, a police report, B.M.D.'s statement to police and a crash reconstruction report. Pandina concluded B.M.D. ingested "four (and possibly five) medications on the date of the collision including: [d]uloxetine (Cymbalta), [lamotrigine] (Lamictal), [l]ithium carbonate (Lithobid) and [dexmethylphenidate hydrochloride (Focalin)]." Each of these medications carry side effects that, if experienced,

may impair a person's ability to drive, including dizziness, sleepiness, blurred vision and loss of coordination. However, the record lacks any evidence B.M.D. was experiencing one or several of these side effects before, during or after the fatal crash.

B.M.D. provided a statement to police and acknowledged she took some, but not all, of her medications. In her deposition testimony, she admitted to ingesting Focalin on the morning of the crash and that it had, in the past, made her feel "speedy." Yet, police at the scene declined to question her further on whether she was impaired by her medications. The police report does not describe her as exhibiting behaviors that might be consistent with the side effects of her medication, such as slurred words, squinting, lack of coordination or other observable symptoms. Moreover, B.M.D. was only charged with careless driving, not driving while intoxicated. Neither expert applied their expertise in neuropsychology, psychiatry or clinical psychopharmacology to prove how they knew B.M.D. was impaired even though no officer at the scene observed she was exhibiting symptoms consistent with the side effects of the medication.

Pandina opined his conclusion was supported by the crash reconstruction. Prior to the crash, visibility was clear, no cars were approaching from the other direction and B.M.D. had room to safely pass

Schrope. However, Pandina does not explain how B.M.D.'s actions were caused by the side effects of her medication. In part, Pandina based his conclusion on an assertion that B.M.D.'s description of the crash given at the scene was inconsistent with the reconstruction report. Yet, Pandina failed to offer any explanation as to why he believed B.M.D.'s inconsistent recollection was indicative of her impairment.

Instead, both expert reports conclude that if B.M.D. ingested all the medication she was prescribed on the date of the crash, she could have experienced all of the debilitating side effects. However, this conclusion was not based on B.M.D.'s observable behavior at the time of the crash. As a result, the expert reports offer little more than conclusory assertions. Considering the record's lack of direct or circumstantial evidence indicating B.M.D. was impaired, the expert reports alone are insufficient to generate a genuine issue of material fact on the issue of B.M.D.'s impaired driving. See Townsend, 221 N.J. at 55 ("A party's burden of proof on an element of a claim may not be satisfied by an expert opinion that is unsupported by the factual record or by an expert's speculation that contradicts that record."); Dawson, 289 N.J. Super. at 324-25 (if an expert's report is without factual support, the plaintiff must sustain a prima facie showing of proximate cause through other reliable evidence). Therefore, we affirm the trial court's dismissal of plaintiff's

claim as a matter of law, because no reasonable jury could find, based on the proofs submitted, the medication Lerner prescribed caused B.M.D. to strike Schrope with her car.

IV.

Cases from other jurisdictions confirm our conclusion that a prescribing practitioner cannot be held liable for an injury caused by their patient unless the injury was caused by the medication prescribed or narcotic administered. In Coombes v. Florio, 877 N.E.2d 567, 572 (Mass. 2007) (Ireland, J., concurring), the Supreme Judicial Court of Massachusetts held, in a plurality opinion, that "a physician owes a duty of reasonable care to everyone foreseeably put at risk by his failure to warn of the side effects of his treatment of a patient." The patient in Coombes was prescribed a variety of medications, some of which caused drowsiness, but received no warning against driving. Id. at 568-69. The patient lost consciousness while driving and struck the plaintiff. Id. at 569.[8]

---

[8] The Coombes decision was, in part, based on Cottam v. CVS Pharmacy, 764 N.E.2d 814 (Mass. 2002). There, the Massachusetts court held, as a general matter, a pharmacist owes no duty to warn a customer of the potential adverse side effects of a prescription. Id. at 819-20. Rather, the court applied the learned intermediary doctrine and determined the physician was in a better position to provide warnings in the context of the physician-patient relationship. Id. at 820. The Coombes court applied Cottam and explained "that a doctor's duty of reasonable care, owed to a patient, includes the duty to
(continued)

McKenzie v. Hawaiʻi Permanente Medical Group, Inc., 47 P.3d 1209, 1211 (Haw. 2002), presented a similar factual scenario to Coombes, where a patient, who was not informed of a side effect of medication, fainted while driving and struck the plaintiff. The defendant-doctor argued, absent a special relationship between him and his patient, he owed no duty to warn his patient for the benefit of the plaintiff. Id. at 1210-11. The Supreme Court of Hawaiʻi disagreed and cited to Restatement (Second) of Torts § 302 for the proposition that "[a] negligent act or omission may be one which involves an unreasonable risk of harm to another through . . . (b) the foreseeable action of the other[] [or] a third person[.]" Id. 1213 (quoting Restatement (Second) of Torts § 302). To be sure, "Restatement (Second) [of Torts] § 302 by itself does not create or establish a legal duty; it merely describes a type of negligent act." Ibid. The court then considered the cost of imposing a duty to warn and observed "imposing a duty would create little additional burden upon physicians because physicians already owe their own patients the same duty[.]" Id. at 1220. Accordingly, the court held "[a] physician owes a duty to non-patient third

_____

(continued)
provide appropriate warnings about side effects when prescribing drugs." 877 N.E.2d at 570. As a result, "[t]he occurrence of known side effects, and the impact of such side effects on the patient's ability to drive, are foreseeable results of that prescription." Id. at 573.

parties injured in an automobile accident caused by an adverse reaction to . . . medication" but qualified the holding by noting it applies "where the circumstances are such that the reasonable patient could not have been expected to be aware of the risk without the physician's warning." Id. at 1221-22.

Courts in New Mexico and New York have explicitly distinguished between cases where a medication is prescribed versus where it was administered intravenously. In Davis v. South Nassau Communities Hospital, 46 N.E.3d 614, 616 (N.Y. 2015), the patient was administered an intravenous pain killer; however, no hospital employee told the patient she should not drive. Nineteen minutes after she left the hospital, the patient caused a car accident. Ibid. The Davis court imposed a duty to warn on the hospital because it was in the best position to do so and, under New York law, prescribing practitioners were already required to explain the side effects of medications to their patients. Id. at 618, 624. However, the Davis court limited its holding to situations where a drug is administered intravenously. Id. at 622 n.4 ("[W]e have recognized a duty of care running from a physician to third parties where the physician fails to warn his or her patient of potential physical impairments caused by a drug the physician has administered, rather than merely prescribed, to the patient.").

New Mexico courts have made a similar distinction. In a prescription drug case, the Supreme Court of New Mexico focused on the amount of time that had passed between when the prescription was written and when the injury occurred. Lester v. Hall, 970 P.2d 590, 592 (N.M. 1998) ("[W]e determine that the likelihood of injury to [the plaintiff] is not foreseeable to the degree required in order to warrant a duty. The likelihood that a patient using prescription lithium will cause a car accident five days after contact with the doctor is considerably more remote in comparison to a patient who, injected with a narcotic, will cause an accident while driving away from the doctors' office."). But when a drug is administered intravenously, the practitioner does owe a duty to warn against driving because the risk of harm is more immediate. Wilschinsky v. Medina, 775 P.2d 713, 717 (N.M. 1989).

In Coombes, Davis, McKenzie and Wilschinsky, the patients either became unconscious or received intravenous medication, leaving little doubt as to the cause of the motor vehicle accident. Several of the cases Lerner relies upon also involve a patient falling unconscious at the wheel.[9] The facts of

---

[9] For example, the Supreme Court of Kansas dealt with a case where a patient with a sleeping disorder was never warned not to drive and caused a car accident. Calwell v. Hassan, 925 P.2d 422, 424-25 (Kan. 1996). In Calwell, the patient experienced chronic daytime sleepiness and her physician prescribed a sleep aid to encourage nighttime sleep. Id. at 425. The patient never experienced sleepiness while driving, and her physician never felt it was

(continued)

those cases eliminated the need to consider whether the patient's impairment was the cause of the injury. But here, because B.M.D. was not demonstrably impaired by her medication at the time she caused the fatal crash, Lerner cannot be held liable for an injury unrelated to his conduct.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

(continued)
necessary to dissuade her from driving. Ibid. The Supreme Court of Kansas focused on the relationship between practitioner and patient and held there was no duty to warn. Id. at 433.

In Gilhuly v. Dockery, 615 S.E.2d 237, 238 (Ga. Ct. App. 2005), the patient received intravenous medication that caused drowsiness, was never warned against driving and subsequently caused a car accident. The Gilhuly court concluded there was no duty to warn the patient because the doctor had no special relationship with the "motoring public" and expanding a practitioner's duty in this instance would expose the doctor to liability from the public at large. Id. at 239. We do not consider Gilhuly persuasive because it is more foreseeable that a patient who receives an intravenous narcotic would experience immediate side effects than a patient who takes a prescription outside the prescriber's care.