**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1837-18T1

DANIEL BLAND,

     Plaintiff-Appellant,

v.

K.R., and NEW JERSEY
MANUFACTURERS
INSURANCE COMPANY,

     Defendants,

and

LISA JORDAN-SCALIA, D.O.,
RARITAN FAMILY HEALTH
CARE, P.A., MANISH B.
VIRADIA, M.D., HUNTERDON
ORTHOPEDIC INSTITUTE, P.A.,[1]
RICHARD HALL COMMUNITY
MENTAL HEALTH CENTER, and
LAURA KOLLER, MA, LAC,[2]

     Defendants-Respondents.

_____

---

[1]  Hunterdon Orthopedic Institute is now known as Mid Jersey Orthopaedics.

[2]  Laura Koller was improperly pled as Laura Keller, MA, LAC.

Argued February 12, 2020 – Decided May 15, 2020

Before Judges Whipple, Gooden Brown, and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-1077-14.

Michael B. Zerres argued the cause for appellant (Blume, Forte, Fried, Zerres & Molinari, PC, attorneys; Michael B. Zerres, of counsel and on the briefs; Ashley A. Smith, on the briefs).

Gary L. Riveles argued the cause for respondents Lisa Jordan-Scalia, D.O. and Raritan Family Health Care, P.A. (MacNeill, O'Neill & Riveles, LLC, attorneys; Gary L. Riveles, of counsel; Anelia Dikovytska Brown, on the brief).

John P. Shusted argued the cause for respondents Manish B. Viradia, M.D. and Hunterdon Orthopedic Institute P.A. (German, Gallagher & Murtagh, attorneys; John P. Shusted, of counsel and on the brief).

Francesco Taddeo argued the cause for respondents Richard Hall Community Health Center and Laura Koller, MA, LAC.

PER CURIAM

Plaintiff appeals from three orders dated September 18 and 28, 2018, and October 26, 2018, granting summary judgment to defendants Lisa Jordan-Scalia, D.O. and her employer Raritan Family Health Care, P.A. (RFHC); Manish B. Viradia, M.D. and his employer Hunterdon Orthopedic Institute, P.A. (HOI);

2

and Laura Koller, MA, LAC and her employer Richard Hall Community Mental Health Center (RHCMHC), as well as three orders denying reconsideration dated October 30, 2018, and December 3 and 12, 2018. We affirm.

This case arises out of an automobile accident. On May 20, 2014, defendant K.R. (Kay)[3] was driving and drifted into the opposite lane, where she collided head-on with plaintiff Daniel Bland, causing him serious orthopedic injuries. Kay was cited for the accident and pled guilty to unsafe driving.

Prior to the accident, Kay was seen by various doctors and mental healthcare professionals: Dr. Jordan-Scalia, a general practitioner; Dr. Manish Viradia, a neurologist; and Laura Koller, a therapist. Plaintiff filed suit on August 6, 2014, naming Kay as the defendant, but later added Jordan-Scalia and her employer RFHC, as well as Viradia and his employer HOI, as defendants, alleging they were negligent in the diagnosis of Kay's condition and deviated from accepted standards in rendering medical care, which resulted in plaintiff's injuries.

---

[3] We use the defendant driver's initials and a pseudonym to ensure confidentiality throughout this opinion because the record indicates she was subject to civil commitment. R. 1:38-11.

Plaintiff and Kay settled, and the matter as to Kay was dismissed with prejudice. The remaining defendants' initial motions to dismiss pursuant to Rule 4:6-2 for failure to state a claim upon which relief could be granted were denied.

Plaintiff filed a second amended complaint—this time alleging defendants Jordan-Scalia, RFHC, Viradia, and HOI were "negligent and careless in their failure to report [Kay's] condition of recurrent periods of unconsciousness or impairment or loss of motor coordination" to the Director of the New Jersey Motor Vehicle Commission (MVC) pursuant to N.J.S.A. 39:3-10.4, which resulted in plaintiff's injuries. The initial common law negligence claims against Jordan-Scalia and Viradia and their employers contained in the first amended complaint were not included in the second amended complaint. Plaintiff later filed a third amended complaint adding licensed therapist Laura Koller and her employer RHCMHC. The complaint against Koller and the two doctors re-asserted the failure to report Kay's condition to the MVC pursuant to N.J.S.A. 39:3-10.4.

In her deposition, Jordan-Scalia testified Kay was a prior patient who left Jordan-Scalia's practice for insurance reasons, but who had recently come back to see her for a physical in March 2014. Kay, who had a history of depression

and anxiety, reported being prescribed Prozac and Klonopin. At the end of the physical, Kay stated she thought she had been having seizures for the past year.

Based on this self-report, Jordan-Scalia sent Kay to see neurologist Viradia for an EEG[4] and full work-up to confirm a diagnosis. Jordan-Scalia did not diagnose or treat for seizures as part of her practice, but testified she advised Kay not to drive. Kay told Jordan-Scalia she had already ceased driving, and in fact had her boyfriend drive her to the physical that day. While Jordan-Scalia was aware of the statutory requirement to report a patient with seizures to the MVC, she did not do so here because it was a self-report and there was no diagnosis.

When Jordan-Scalia next saw Kay a couple months later on May 12, Jordan-Scalia had received Viradia's initial assessment; it included a list of tests ordered but offered no definitive diagnosis. Kay's boyfriend drove her to the appointment, and Kay told Jordan-Scalia her boyfriend drove her everywhere. Kay reported she had been in a psychiatric hospital for three weeks, where she was diagnosed with bipolar affective disorder. Kay was now taking Haldol, Topamax, Trileptal, Trazodone, and Cogentin, all prescribed by a psychiatrist at the psychiatric hospital.

---

[4] EEG stands for electroencephalogram.

Kay visited Jordan-Scalia again a few days later on May 20, the day of the accident; Kay asked for a refill of psychiatric medicine to hold her over until her next psychiatrist appointment on May 28. Kay's medical record noted she agreed to go to a psychiatric emergency center "if any suicidal or homicidal ideations occur," which Jordan-Scalia stated is something she may say to a patient on psychiatric medications, but she did not recall specifically why she told Kay at that visit. Kay reported she drank a couple of alcoholic beverages daily, and while Jordan-Scalia did not notice any signs of alcohol consumption during the visit, it was her practice to warn patients of potential interaction between alcohol and their medications.

As for Viradia, he first saw Kay at HOI on April 7, on Jordan-Scalia's referral, "to rule out [the] possibility of seizures." Kay was accompanied by her boyfriend to the appointment, and they discussed how he was driving her everywhere at that time. Viradia testified in his deposition that while not documented in the record, he told Kay it was important she not drive, and stated it was standard practice for him to advise his patients as such.

Viradia ordered tests and listed "convulsions" and "simple partial seizures" as a primary diagnosis, but testified it was "an impression . . . [i]t is not a diagnosis. When you initiate a workup, there is no diagnosis," and testified

those codes were used so insurance would authorize the test. He stated "one cannot diagnose seizure or epilepsy on seeing a patient one time," and unless he put something pertinent to the epilepsy spectrum in the diagnosis spot on the form, Kay "would never get any test that she needed to rule it out or rule it in."

Viradia also listed multiple "differential" diagnoses, which included insomnia, alcohol-related issues, recreational drug use, prescription drug use not disclosed to him, sleep deprivation, psychiatric problems, and pseudoseizures; he testified "seizure was the last thing I was thinking. However, [Kay] was sent to me to rule that out and that was my job to do so." He indicated Kay told him she was only on Prozac and he did not know if she was on any medication to treat seizures.

Viradia had reported patients to the MVC in the past, likely over 100 times, by fax or mail, and those decisions were made on a case by case basis; here, Kay's boyfriend drove her and reported he was taking her to appointments, and Viradia asserted he was told that Kay was no longer driving. A couple months after the accident, the results of the tests ordered by Viradia for Kay turned out to be normal.

Koller was a licensed associate counselor at RHCMHC who began seeing Kay on March 12, 2014, and saw her a total of three times between then and the

May 20 accident. Kay's initial comprehensive assessment at RHCMHC indicated Kay reported delusions, amnesia, and sleepwalking.

Kay reported she was blacking out, had been violent, and exhibited signs of psychosis while she was taking prednisone for a misdiagnosis of lupus. An April 15 note states a "friend" of Kay's called to tell Koller that Kay had been experiencing "petit seizures and instances of blacking out and not remembering certain things she's done." Koller also learned at that time that Kay had been admitted as an inpatient to a psychiatric hospital and would not make her next appointment; the record indicates Kay was admitted after trying to stab her boyfriend.

Upon discharge from the hospital, Kay was referred for follow up psychiatric treatment because she was brought to the hospital intoxicated, "express[ing] thought[s] of wanting to kill herself," and "drinking more than usual . . . and has a history of blackouts and some seizure episodes." Kay "reported drinking [three to four] glasses of wine in order to 'heal her depression' in addition to taking her prescribed Klonopin."

Koller next saw Kay on May 20, the day of the accident, from around 2:00-2:50 p.m., where Kay was "tearful" and said her friends and parents were concerned about her behavior at night and her sleepwalking. Kay had been

kicked out of her house by her sons and ex-boyfriend and was currently living with her ex-husband. Koller referred Kay for a substance abuse evaluation and noted she

> currently struggles with depression and many medical issues. Some not diagnosed. [Kay] was hospitalized three times during the past month and reported that friends and family members are accusing her of drinking when she is not. [Kay] said that she has a problem when she drinks, but she does not have a drinking problem.

The June 11 summary of treatment stated "[Kay] has had a history of blackouts, psychotic behavior, emotional volatility and substance use issues. [Koller] had difficulty detecting [the] origin of [Kay]'s symptoms, alcohol use, medication and/or abuse. [Kay] agreed to [a] higher level of care . . . evaluation."

As for Kay, she testified in her deposition she had no recollection of the accident. She stated she went to work, to two doctor's appointments, and then at around 2:30 p.m. met a friend at a deli, after which she drove to Pennsylvania; the last thing she remembered was stopping for gas and calling her ex-husband.

Kay stated she was taking Trileptal, Baclofen, and a blood pressure medication. She stated Trileptal was a seizure medication prescribed to her, but did not remember who prescribed it. Kay asserted she did not remember the last

time she blacked out before the accident, did not recall anything about blackouts, and had not blacked out since. In response to a question asking whether a blackout might be what caused the accident, she agreed a blackout might be an explanation.

Kay recalled little about her conversations with Jordan-Scalia and Viradia. She recalled filling out the initial intake application for RHCMHC, but did not recall why, other than she had frequent falls, then later stated it was because she was depressed. Kay did not recall being intoxicated during an earlier November 2013 incident where she received a laceration, although medical records suggested her blood alcohol level was 0.182. Nor did she recall the circumstances of her involuntary commitments during April and May of 2014, or the circumstances surrounding the police being called because of her interactions with her boyfriend.

Kay remembered being very stressed between March and May 2014 because she did not feel well. She stated she drove "[v]ery little" and made an effort to have her boyfriend drive her during this time because she didn't feel well, but would drive occasionally "[i]f [she] felt okay." She answered in the negative when asked if she "believe[d] if the [MVC] had temporarily suspended your license you would have driven a car?"

Damian F. Rigatti, D.O., plaintiff's expert, opined that Jordan-Scalia deviated from the accepted medical standard of care because she did not file a report to the MVC on Kay's first self-report of a seizure, and because there was no written record that Jordan-Scalia advised Kay not to drive. Rigatti conceded, however, that while Kay self-reported a history of more than one seizure, she had never been treated for seizures.

Rigatti noted the medications Kay had refilled through Jordan-Scalia had side effects including impaired concentration, impaired driving skills, seizures, drowsiness, and suicidal ideation, although he later clarified Jordan-Scalia only refilled the Trileptal, which was a mood stabilizer prescribed by a different doctor. Rigatti acknowledged hospital records questioned whether Kay intentionally drove into plaintiff's vehicle as a suicide attempt, and opined her medications "can increase suicidality."

Rigatti opined Jordan-Scalia should also have reported Kay to the MVC because her medications could result in impairment and cause an accident. He asserted that given Kay's "multiple encounters with psychiatric admissions," and "[e]rratic, sometimes violent, behavior," in March and April, her ability to follow instructions not to drive should have been perceived as unreliable.

A-1837-18T1

His opinion of what caused Kay to swerve into the other lane was equivocal. Rigatti said a seizure was "a possible diagnosis," as was blacking out, or "syncope," falling asleep at the wheel, and suicidality.

Richard Lechtenberg, M.D., a neurology expert, prepared an expert neurological report for plaintiff. He noted Kay had numerous ailments, and as of April 7, was taking Prozac for agitated depression or possibly bipolar affective disorder, and as of May 12 was prescribed Haldol, Topamax, Trileptal, Trazadone, and Cogentin, and on May 20 was prescribed Trileptal and Baclofen. Dr. Lechtenberg opined, based only on the records provided, that Kay's appropriate diagnoses at the time of the accident were agitated depression and complex partial seizures.

He opined Kay was being tested for episodes of altered consciousness or loss of consciousness at the time of the accident, and may have just started on anti-epileptic medication and may not have been adequately medicated to suppress seizure activity, "if in fact seizure activity was the basis for her disturbances of consciousness." It was his opinion that it was "clearly irresponsible" for her to be driving, whether her impairment was because of a seizure disorder or an affective disturbance. He asserted her episodes of altered consciousness were "a sufficient basis for alerting the [MVC] to suspend her

12

driver's license until these episodes were fully eliminated," and that it was a deviation from the accepted standards of care not to do so.

While he contended Kay was diagnosed by Viradia, Jordan-Scalia, and Koller as having a seizure disorder, he conceded a "differential diagnosis" is only a possible diagnosis, where a regular diagnosis would be one supported by evidence. He noted that while some of the medications Kay was prescribed are also antiepileptics, he acknowledged those drugs were not prescribed specifically for a seizure disorder and that Trileptal in particular was prescribed off-label for a variety of things. He opined that it was a deviation from the standard of care for Viradia not to have established Kay was on antiepileptic medications when he saw her, and if he established she was not, it would have been a deviation not to prescribe an antiepileptic and not to report her to the MVC.

A third plaintiff's expert, Steven A. Fayer, M.D., P.C., a psychiatrist, prepared an expert report to offer an opinion as to the care given Kay by Koller and RHCMHC. Fayer reviewed Kay's inpatient psychiatric records from her hospitalization on April 27, to May 3, 2014. Those records stated Kay had a five-year history of depression, and her first hospital admission was "a few

months ago" when she threatened her boyfriend with a knife and police were called, which she denied remembering or even that it happened.

The records reported Kay "may have seizures in the past, not sure," with a diagnosis of bipolar disorder, alcohol dependence, and noncompliance. Fayer stated this diagnosis was a "dangerous combination of circumstances." There was also a note in the records stating Kay took 0.5 mg of Klonopin and muscle relaxers before the accident, which Fayer stated could cause drowsiness.

Fayer noted Kay had a history of alcohol use, minimized her alcohol abuse, and records showed she "has experienced symptoms of withdrawal when attempting to discontinue use." The May 4 hospital discharge summary indicated she was "anxious, nervous, depressed, withdrawn," but compliant with treatment, and that day seemed better, wanted to be discharged, and did not report homicidal or suicidal ideations or hallucinations. The final diagnosis was bipolar disorder and alcohol dependence, and she was to be discharged to an outpatient clinic.

Fayer opined it was a deviation from good and accepted mental health practices for Koller not to have contacted the MVC about Kay's "history of seizure disorders and/or alcohol abuse," although he retracted that statement in his deposition upon a reading of the statute. Fayer conceded there were no

14

codified standards, but opined it would be good and acceptable practice to make sure someone is not driving that possibly has a seizure disorder, blackouts, and is drinking; although Kay was not specifically diagnosed with seizure disorder, he said Koller was aware of possible seizures from the phone call she received from Kay's unidentified "friend."

After discovery ended, defendants Jordan-Scalia and RFHC moved for summary judgment, arguing failure to report under N.J.S.A. 39:3-10.4 did not create a private cause of action—rather, the statute simply calls for a fine. Defendants Viradia and HOI also moved for summary judgment, as did defendants Koller and RHCMHC.

The trial court agreed with defendants that N.J.S.A. 39:3-10.4 does not confer a private cause of action, and additionally, the alleged failure to notify the MVC of the alleged seizure disorder "cannot, under any reasonable basis, be determined to be . . . a proximate cause of this accident." The trial judge granted Jordan-Scalia and RFHC, as well as Viradia and HOI, summary judgment.

The trial judge also granted summary judgment to Koller and RHCMHC after finding Koller was not a physician, but rather a social worker who "got lumped in with" the other defendant-physicians with the failure to follow the statute, which only mandates reporting by treating physicians. The judge noted

the claim at issue was "not a general negligence claim," but rather a claim of carelessness and negligence in failure to report Kay's condition to the MVC pursuant to the statute and there was "no possible basis for liability against [Koller] or her employer regardless of the proximate cause issue, which, in any event, I find doesn't exist. . . ."

Plaintiff moved for reconsideration of the summary judgment motions as to all defendants, asserting as his basis to do so that 1) the court should have considered an unpublished Appellate Division opinion,[5] and 2) that Kay testified during her deposition she would not have driven a car if the MVC had suspended her license. The motions for reconsideration were denied.

This appeal followed.

## I.

We review summary judgment de novo, using the same standard as that employed by the trial court. Hinton v. Meyers, 416 N.J. Super. 141, 146 (App. Div. 2010) (citing Turner v. Wong, 363 N.J. Super. 186, 198-99 (App. Div. 2003)). Rule 4:46-2 provides that a court should grant summary judgment when the pleadings, depositions, answers to interrogatories and admissions on file,

---

[5] Corso v. State, No. A-2860-06 (App. Div. May 27, 2009).

along with any affidavits, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

> [W]hether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
>
> [Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).]

To sustain a cause of action for negligence, the plaintiff must establish the four elements of: 1) duty of care, 2) breach of that duty, 3) proximate cause, and 4) damages. Townsend v. Pierre, 221 N.J. 36, 51 (2015) (citing Polzo v. Cnty. of Essex, 196 N.J. 569, 584 (2008)). The plaintiff must do so "by some competent proof." Ibid. (quoting Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014)).

The question of whether a duty exists is a matter of law. Carvalho v. Toll Bros., 143 N.J. 565, 572 (1996) (citations omitted). Foreseeability of the injury is a "crucial element" when determining whether the imposition of a duty is appropriate; "[o]nce the foreseeability of an injured party is established, . . . considerations of fairness and policy govern whether the imposition of a duty is warranted." Id. at 572-73 (second alteration in original) (quoting Carter

Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 194-95 (1994)).

"The analysis is both very fact-specific and principled; it must lead to solutions

that properly and fairly resolve the specific case and generate intelligible and

sensible rules to govern future conduct." Vizzoni v. B.M.D., 459 N.J. Super.

554, 568 (App. Div. 2019) (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J.

426, 439 (1993)).   Assessing fairness and policy requires consideration of

several factors, including the relationship of the parties, the nature of the

attendant risk, the opportunity and ability to exercise care, and the public interest

in the proposed solution.  Carvalho, 143 N.J. at 573 (citing Hopkins, 132 N.J. at

439).

Plaintiff argues Jordan-Scalia, Viradia, and their respective employers

owed plaintiff a duty under N.J.S.A. 39:3-10.4 to report Kay to the MVC for her

self-reported seizures, and that they breached that duty.  We disagree.

N.J.S.A. 39:3-10.4 provides that:

> Each physician treating any person [sixteen] years of
> age or older for recurrent convulsive seizures or for
> recurrent periods of unconsciousness or for impairment
> or loss of motor coordination due to conditions such as,
> but not limited to, epilepsy in any of its forms, when
> such conditions persist or recur despite medical
> treatments, shall, within [twenty-four] hours after his
> determination of such fact, report the same to the
> Director of the [MVC]. . . .

[(Emphasis added).]

N.J.S.A. 39:3-10.5 also requires that the individual suffering from the symptoms enumerated in section 10.4 must themselves also report the existence of their condition to the MVC at the time they apply for an initial driver's license or for a renewal of an existing license. There is a $50 fine for failure to report for both the physician and the individual under N.J.S.A. 39:3-10.8.

N.J.S.A. 39:3-10.4 provides no basis for claims of negligence against the medical defendants, and there is no binding case law establishing a cause of action for the violation of N.J.S.A. 39:3-10.4 to protect against the physical harm to others that may result from a driver whose condition makes it unsafe for them to drive.

Further, a plain reading of the statute indicates it requires a report to the MVC where the enumerated symptoms "persist or recur despite medical treatments." There is no evidence in the record, other than her own self-reports, that Kay had seizures in the first place, let alone that they recurred after her visits to Jordan-Scalia or Viradia. Other than a vague indication, in response to a deposition question, that a blackout "might" have caused the accident, Kay testified she did not remember the last time she had a blackout before the

accident, had not blacked out since, and also said later she did not recall anything about blackouts.

Additionally, we reject plaintiff's assertion the doctors' visits constituted treatment; the statute states a report must be made if the condition persists or recurs "despite medical treatments," which suggests an active treatment that would be expected to result in change. Here, there is no indication there was a recurrence at all, let alone a recurrence despite treatment, as both doctors were still awaiting the test results. Although Kay was prescribed anti-seizure medications, they were not prescribed by either Jordan-Scalia or Viradia, and there is no evidence they were prescribed for seizures.

Further, a report to the MVC is required "within [twenty-four] hours after [the physician's] determination" that the conditions persist and recur despite the medical treatments. Neither Viradia nor Jordan-Scalia ever determined there was a recurrence of symptoms enumerated in the statute despite medical treatment. To the contrary, both doctors were still awaiting test results, Viradia testified seizures were the lowest on his list of possible differential diagnoses, Kay testified in her deposition she did not recall having seizures at all, and subsequent tests showed Kay did not suffer from seizures.

A-1837-18T1

Finally, the MVC process indicates more than a self-report, referral, and order of tests triggers the requirement that a physician report an individual to the MVC. Once an individual has been reported to the MVC, the Director forwards "all pertinent reports," including the treating physician's statement as to diagnosis, treatment, and prognosis, to the specially-formed Neurological Disorder Committee for review. 24 Ramsey, N.J. Practice, Motor Vehicle Law and Practice § 2:36 (4th ed.) (citing N.J.A.C. 13:19-5.5); N.J.A.C. 13:19-5.3, -5.4. The Committee performs an independent analysis based on the evidence, and then makes a recommendation to the Director as to whether the individual may retain his or her license or whether it should be suspended. Ibid. (citing N.J.A.C. 13:19-5.6). From this, it can be inferred that to warrant a report to the MVC, there must be some history, investigation, and evidence from which the Committee can make an assessment.

Therefore, because there was no diagnosis, no treatment, and no recurrence, there is nothing in the plain reading of the statute or in the MVC process to indicate either Jordan-Scalia, Viradia, or their employers had a duty to report Kay to the MVC, and summary judgment on this ground was appropriate.

## II.

Plaintiff argues the trial court should have considered whether plaintiff could prove an independent basis for a claim of common law medical negligence against Jordan-Scalia and Viradia, based on plaintiff's experts' reports as to their alleged negligence under common-law malpractice principles. However, plaintiff's claims were not for common-law malpractice. While the first complaint alleged Jordan-Scalia and Viradia were negligent and deviated from accepted standards in rendering medical care, which resulted in plaintiff's injuries, those claims were dropped in the second and third amended complaints, and changed to negligence in their failure to report Kay to the MVC under the statute. Therefore, this argument is without merit.

Plaintiff also argues that under the applicable standard of care according to Fayer, Koller had a duty to contact appropriate persons who could make a determination and take appropriate action to ensure Kay was not driving since there was an "index of suspicion that the patient may be dangerous." Additionally, plaintiff argues, under Corso a genuine issue of material fact exists as to whether the applicable standards of care mandated that Koller arrange for a medical or psychiatric consultation given her awareness of Kay's history. Plaintiff asserts a jury could find Koller was negligent in failing to effectively

22

deter Kay from driving, including but not limited to reporting her condition to the MVC.

These arguments are also without merit. The claim against Koller was only that she was negligent in failing to report Kay to the MVC, not that she deviated from general standards of care. Koller was aware that Kay was under the care of other physicians, and as a non-physician Koller had no duty to take any action under N.J.S.A. 39:3-10.4. Further, the record reflects that Koller did refer Kay to a higher level of care than she could provide and was in the process of referring her to a substance abuse program.

III.

Plaintiff argues the breaches of the alleged duty of defendants to report Kay to the MVC were the proximate cause of plaintiff's injuries, in that the negligence of the health care defendants was an efficient cause that set the series of events into motion, which led to plaintiff's injuries. Plaintiff asserts Kay's testimony that she would not have driven a car if her license had been suspended demonstrates Kay would not have been driving at all on May 20, and that a jury could reasonably conclude that but for the negligence of the healthcare provider defendants, the accident would not have occurred.

Plaintiff also asserts Kay blacked out, which caused the accident, and that if she were not driving while having a seizure the accident would not have occurred. Additionally, plaintiff argues the issue of causation is a question of fact for a jury to consider after trial, under Yun v. Ford Motor Company, 276 N.J. Super. 142, 156 (App. Div. 1994), rev'd. on other grounds, 143 N.J. 162 (1996).

When the evidence "is so one-sided that one party must prevail as a matter of law," summary judgment should be granted. Brill 142 N.J. at 540 (citation omitted). The opposing party must produce evidence that creates a genuine issue of material fact, and "[c]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion." Vizzoni, 459 N.J. Super. at 567 (citation omitted).

"A party cannot defeat a motion for summary judgment merely by submitting an expert's report in his or her favor," but rather, the expert report must create a genuine issue of material fact. Brill, 142 N.J. at 544. An expert opinion must be grounded in facts or data, and the net opinion rule forbids admission of an expert's conclusions that are not supported by factual evidence or other data – the expert must "give the why and wherefore" that supports the opinion and not just "a mere conclusion." Townsend, 221 N.J. at 53-54 (quoting

24

Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)) (other citations omitted). If there is no genuine issue of material fact, we look to whether the trial court correctly interpreted the law, according the trial judge's legal conclusions no deference. Vizzoni, 459 N.J. Super. at 567 (citations omitted).

The plaintiff may prove causation through "legitimate inference, so long as the proof will justify a reasonable and logical inference as distinguished from mere speculation." Vizzoni, 459 N.J. Super. at 576 (quoting Kulas v. Pub Serv. Elec. & Gas Co., 41 N.J. 311, 319 (1964)). Proximate cause may "be removed from the jury's determination if causation depends on the validity of an expert's report." Id. at 576 (first citing Townsend, 221 N.J. at 57-58; then citing Dawson v. Bunker Hill Plaza Assocs., 289 N.J. Super. 309, 324 (App. Div. 1996)). Therefore, where "no reasonable factfinder could find that the plaintiff has proven causation by a preponderance of the evidence, summary judgment may be granted dismissing the plaintiff's claim." Townsend, 221 N.J. at 60.

Here, there is no evidence Kay suffered a seizure or other symptom enumerated under the statute at the time of the accident, other than Kay's own response to a deposition question that a blackout "might" have been the cause, and Rigatti's conclusion that a seizure was one of many other possible causes of

the accident, including falling asleep at the wheel and suicidality. A review of the record shows numerous factors that could have caused Kay to drift over the center line head-on into plaintiff's car, including: alcohol abuse; multiple medications that, according to Rigatti, had side effects that included impaired concentration, seizures, drowsiness, and suicidal ideation; a recent history of suicidal thoughts; a recent history of violent acts; and, as Fayer noted, Kay reported that before the accident she took 0.5 mg of Klonopin and muscle relaxers, which have side effects of dizziness, unsteadiness, weakness, and drowsiness.

Therefore, the record does not establish it is more likely than not that Kay suffered a seizure that caused the accident, but only that it was a remote possibility, as seizure disorder was later ruled out by the test results.

Finally, plaintiff's argument that Kay would not have driven at all that day had defendants reported her to the MVC, and plaintiff would not have been injured, is completely speculative. Not only is it speculative to suggest Kay would not have driven had her license been suspended, but it is also speculative that her license would have been suspended in the first place. The MVC process takes time, as the Committee reviews the evidence and makes an analysis before making a recommendation to the Director. Further, the Director has wide

26

discretion as to whether and when to suspend or allow an individual to retain his or her license under N.J.A.C. 13:19-5.7. The Director may or may not suspend a driver's license before receiving the Committee's recommendation, upon notice and an opportunity to be heard under N.J.A.C. 13:9-5.2, and even after the Committee makes its recommendation, it is not binding on the Director; the Director may or may not suspend an individual's license no matter what the Committee's recommendation under N.J.A.C. 13:19-5.7. Given the MVC process and the Director's discretion, there is no way to know whether the MVC would have suspended Kay's license either before the accident or at all.

Therefore, given the other potential and more likely causes of Kay's accident, the lack of evidence Kay suffered from a reportable disorder, and the process that ensues once an individual has been reported to the MVC, that defendants' failure to report Kay to the MVC was the proximate cause of plaintiff's injuries is "pure speculation or conjecture" and summary judgment was appropriate on this ground as well. Plaintiff's remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27                                                    A-1837-18T1