**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3598-23

S.V.,[1]

      Plaintiff-Respondent,

v.

APPROVED FOR PUBLICATION

February 28, 2025

APPELLATE DIVISION

RWJ BARNABAS HEALTH,
INC. A/K/A RWJ BARNABAS
HEALTH BEHAVIORAL
HEALTH NETWORK A/K/A
BARNABAS HEALTH BEHAVIORAL
HEALTH CENTER, JARED N. TOSK,
M.D., AZUKA OFODIKIE, APN, and
ARNOLD A. WILLIAMS, M.D.,

      Defendants/Third-Party
      Plaintiffs-Appellants,

v.

J.V.,

      Third-Party Defendant.

_____

Argued January 6, 2025 – Decided February 28, 2025

Before Judges Sabatino, Gummer, and Berdote Byrne.

---

[1] We use initials for plaintiff and her sister J.V., a psychiatric patient, for reasons of medical privacy. R. 1:38-3(a)(2). The record is sealed.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2264-19.

John H. Hockin, Jr. argued the cause for appellants (Ronan Tuzzio & Giannone, PA, attorneys; John H. Hockin, Jr. of counsel and Michael J. Kafton, on the brief).

Michael Confusione argued the cause for respondent (Hegge & Confusione, LLC. attorneys; Michael Confusione, of counsel and on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

In this medical malpractice case, plaintiff S.V. alleges that defendants prematurely released her sister ("J.V.") from their care after J.V. was treated for seventeen days on a voluntary admission basis for psychiatric care at defendants' facility. The day after her psychiatric discharge, J.V. crashed her car into a utility pole, injuring plaintiff S.V. who was a passenger in the vehicle.

Plaintiff's medical expert contends defendants breached their professional standards of care by releasing J.V. prematurely, while her medications were still being adjusted and her condition allegedly was not yet sufficiently stabilized. This "premature release" theory is at the core of plaintiff's claim of negligence.[2]

---

[2] Notably, plaintiff did not argue to the motion judge that defendants owed her a duty to warn her that J.V. was too unstable to drive a car or of any other dangers relating to J.V.'s condition.

The trial court denied defendants' motion for summary judgment in an order dated May 31, 2024. Among other things, the court rejected defendants' argument that they owed no legal duty to plaintiff in the circumstances presented. We granted leave to appeal, limited to the discrete issue of whether defendants owed a duty to plaintiff with respect to her claims.

For the reasons that follow, we reverse. Under the circumstances presented, defendants could not have reasonably foreseen that J.V., shortly after her discharge, would cause a motor vehicle crash that would injure plaintiff. In addition, plaintiff's theory of liability—alleging that J.V., a voluntary mental health patient, should not have been discharged—clashes on these facts with the terms of our civil commitment laws.

## I.

We summarize the pertinent facts from the record, viewing them in a light most favorable to plaintiff as the non-moving party on summary judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

### J.V.'s History of Mental Illness

J.V. began developing psychiatric symptoms at the age of seventeen and was diagnosed with schizoaffective disorder and bipolar disorder. Shortly before her eighteenth birthday, she was committed to a facility in New York and

3

remained there for about a year. She was also treated on an in-patient basis at other mental health facilities.

For several years J.V. lived independently as an adult in New York. She moved back in with her mother sometime before 2010. J.V.'s mother passed away in December 2016, leading to a decline in J.V.'s mental health. Nonetheless, plaintiff reported that before the events in 2017 at issue here, J.V. had been free from psychiatric episodes for about twenty years.

### J.V.'s August 31, 2017 Suicide Attempt and Her Voluntary Admission to and Treatment at Barnabas

On August 31, 2017, J.V. called plaintiff and indicated that she had found their deceased father's gun and planned to kill herself. That prompted plaintiff to call J.V.'s psychiatrist and arrange for her admission to the defendant facility, RWJ Barnabas Health, Inc. ("Barnabas"). J.V. was voluntarily admitted to Barnabas that same day, August 31, 2017.

During her seventeen-day stay at Barnabas, J.V. was treated by numerous medical providers, including codefendants Jared N. Tosk, M.D., Arnold A. Williams, M.D., and Azuka Ofodikie, Advanced Psychiatric Nurse (APN). She

A-3598-23

was prescribed several anti-psychotic and other psychiatric medications.[3] The providers at the facility modified the combinations and dosages of the medications several times during J.V.'s stay.

J.V.'s Disposition and Behaviors at Barnabas

According to APN Ofodikie, near the beginning of J.V.'s treatment at Barnabas, she was experiencing delusions, believing other patients were giving her cocaine, and was paranoid about people touching her belongings.

Although the details are not entirely clear from the record supplied to us, J.V.'s condition evidently improved during the course of her stay. The record indicates that at some point J.V. expressed a desire or willingness to be discharged from Barnabas. Consequently, she was referred for a psychiatric screening assessment by Christina Lassik, Masters in Psychological Counseling, to determine if J.V. met the criteria for involuntary commitment.

At her deposition, Lassik acknowledged being aware of a handwritten note[4] made by an unidentified person on the screening assessment request form,

---

[3]  At the time of J.V.'s admission, she had listed prescriptions for eight medications, although at her deposition APN Ofodikie was unsure whether J.V. had been taking all of them.

[4] The summary judgment record provided to us contains only some of J.V.'s medical records and does not include a copy of this note.

indicating J.V. was "still sematic [sic]," "paranoid, disheveled, [and] gravely disabled."  Nonetheless, Lassik also testified that, at the time of her assessment, J.V. was attending group therapy, compliant with medication, and was eating and sleeping appropriately.  Lassik testified that "[a]t the time of my evaluation I did not deem her gravely disabled."  Lassik accordingly determined that J.V. did not meet the criteria for involuntary commitment.

Another mental health professional involved in J.V.'s pre-discharge assessment, Dr. Williams, testified at his deposition that he had been advised by Lassik of the note on the screening request form that J.V. was still symptomatic, disheveled, and paranoid.  However, based on his own assessment, Dr. Williams similarly believed the criteria for involuntary commitment were not met at that time.

Two medical records (supplied to us without objection after the appellate oral argument) illuminate J.V.'s status before her discharge.  A "Behavioral Health Progress Note" issued by Alberto Ballesteros, M.D., on September 16, 2017, stated that J.V. "was seen with staff [and] [r]eported that [she] feels ready to be discharged tomorrow."  Among other things, Dr. Ballesteros noted that J.V.'s appearance, motor activity, speech, and perceptual function were normal, her behavior was cooperative, her mood was anxious and "mood congruent,"

6

and her thought process was goal directed. Dr. Ballesteros also specifically noted that J.V. did not display suicidal or homicidal thoughts or plans and that she displayed no delusions.

A "Social Work Progress Note" dated the next day, September 17, 2017, contained similar observations in anticipation of J.V.'s discharge. The examining social worker favorably wrote:

> Writer met with patient for the purpose of discharge. Patient presented calm and cooperative with bright affect. Patient denied SI/HI [suicidal ideation/homicidal ideation]. She was admitted due to SI and depression. Patient identified improvements in her mood compared to admission. On the unit, she engages in treatment. Patient is receptive to returning home and following up with outpatient treatment. Patient is linked with [an outpatient care facility]. She reports staff at the hospital ha[ve] been supportive and she reports she has learned that she can accomplish her goals. Patient identified she wants to volunteer. Patient will return home today and will be picked up by her sister at 12pm for discharge.

J.V.'s Discharge on September 17, 2017

J.V. was discharged into plaintiff's care on September 17, 2017. The record supplied to us does not reveal the contents of any oral or written discharge instructions the facility staff gave to J.V. or shared with plaintiff. As described by plaintiff, after she picked up J.V. from Barnabas on September 17, they went

7

home and unpacked her items. The sisters then went to a pharmacy, then for a manicure, and then out to dinner, with J.V. doing all the driving.

The September 18, 2017 Car Crash[5]

The next morning, September 18, 2017, J.V. was scheduled for her first outpatient psychiatric appointment. J.V. drove her own vehicle, and plaintiff accompanied her in the passenger seat. On the way to the appointment, they stopped at a bank. After J.V. resumed driving to her doctor's appointment, they were involved in a single-car crash on Route 9.

The accounts of the car crash markedly differ. The police report states that: "[J.V.'s vehicle] was travelling north on [Route] 9, the driver stated that she was getting to[o] close to the vehicle in front of her and started to brake hard and then lost control of her vehicle. The vehicle crossed over the southbound lane and struck a utility pole."

In her first recorded statement to her insurance company, J.V. was asked:

> Q. And in your own words just describe to me how the accident occurred?
>
> A. Well I was going and I don't know all of a sudden I hit the pole and, um, and then I just said like oh, my god what happened.

---

[5] We purposely use the term "crash" because the parties dispute whether the collision was an "accident."

A-3598-23

Q. Okay. You, you don't recall how you [crashed] because it look[ed] like you were in the northbound lane and then went across?

A. I just went out of control.

Q. Okay. You don't recall how, how you [lost] control?

A. No, I really don't know I have no idea.

Q. Okay. And, [were] there any other vehicles involved anybody cut you off anything like that?

A. I don't know, I don't, I really don't recall.

[(Emphases added).]

In her second recorded statement to her insurer, J.V. provided a contrary account, asserting the crash was a purposeful act and that plaintiff had urged her to say so:

Q. All right. My, my question to you is, is yesterday, um, we did secure a recorded statement from you, uh, where you indicated that you didn't recall too much about the accident and, and now today you, you indicated that you know it was, uh, purposeful act which actually is supported by some of the emergency room records from, from your sister?

A. Listen I, I don't—I don't know [what] I am gonna do now—

. . . .

9

Q. Okay. But my question is, is what was the reason for the alteration what—why did you not disclose this yesterday?

A. Because my sister told me and said did you talk to [the insurance company] and I said yes, and she is like what did you say, what did you say—

Q. Okay.

A. —And then she said you better tell him you better tell him that you ran into the freaking, uh, pole you better tell him because this my case. I am not I got to win it and she is going on and on.

In response to the insurer's further questioning, J.V. provided yet another version, stating that she had been reaching to scratch her arm:

Q. Why did the vehicle go out of control?

A. Honestly it I was, I was, um, I was driving and I kind of like my arm I was reaching to scratch myself—

Q. Okay.

A. —And my arm went to the right.

At her own deposition, plaintiff testified that she had observed J.V. suddenly engage in bizarre behavior while driving the car on September 18, 2017:

We were on Route 9 going to Bayville. I just remember the town. And all of the sudden out of the blue [J.V.] went off, completely mad. She was growling like the devil, banging on the steering wheel, looking at me screaming. And the car was going—she wasn't looking. She was just banging and growling at me. And I had to

10

grab the wheel because we were in the oncoming traffic. She didn't even—it was like she wasn't even driving. Just picture someone banging on the kitchen table, that's what it looked like with her screaming. And when the car swayed I grabbed the wheel then she grabbed and she took it back and we just went out of control.

. . . .

[J.V.] took the steering wheel back and lost control. It was raining or misting. And when she grabbed it she grabbed it too hard and we just went flying out of control.

Plaintiff further elaborated:

Q. Am I correct that you would not have gotten into the vehicle on the day of this accident if you thought that there was anything wrong with [J.V.] at that point?

. . . .

A. I would have never gotten in the car if I thought she would have lost it.

Q. And I guess my question then is you didn't have any suspicion when you got into the car that there was anything wrong with—

A. I just knew she was angry. She went off. I can't explain it. She wasn't well. But nowhere would I think this would have happened that she would just lose it. But she loved her car. It's the only thing she owned. It was like the way I love my home, she loved her car. I would never in a million years think this could have happened. I would never have gotten in. I did drive with her the night before, the day before.

11

Q. But even some of the concerns that you talked about, testified earlier about that morning where you said that she didn't want to go to the visit—

A. Correct.

Q. —you did not notice any other issues with J.V. that morning before you got in the vehicle?

A. No.

. . . .

Q. And there is nothing that occurred that you can think of during that car ride? No other vehicles cutting off the vehicle?

A. No.

Q. No arguments with you? No discussions with you? Nothing that you can think of from the time that you got in the car to the time that she had this incident that led to this anger that you described?

A. Nothing.

The car crash caused permanent injuries to plaintiff and required multiple surgeries and other treatments.

Plaintiff's Claims Against Defendants

Plaintiff's complaint named as defendants Barnabas (and its various business names), Dr. Tosk, Dr. Williams, and APN Ofodikie, plus fictitious "John Doe"

12

defendants.[6]   In her complaint, plaintiff alleged she had been injured in an automobile collision when her sister, J.V., suffered "a psychiatric breakdown" while operating a motor vehicle, the day after J.V. had been discharged from defendants' facility and care.  Plaintiff claimed that defendants are responsible for the car crash and her resulting injuries.  Further, plaintiff specifically asserted that "defendants were negligent in discharging J.V. too soon—before she was stable enough for release."[7]

Plaintiff's Expert Report and Deposition

Plaintiff retained a medical expert, Hansel Arroyo, M.D., a licensed New York psychiatrist, to address issues of liability and medical standards of care.

---

[6]  Plaintiff filed claims against J.V. for negligence regarding the automobile accident, which subsequently settled.  J.V.'s attorney has filed with this court a letter of non-participation, declaring J.V. is no longer involved in this matter due to the settlement and is not taking any position on the appeal.

[7]  In her responding brief on appeal, plaintiff propounds an additional theory, asserting that defendants acted improperly "without warning their patient or her sister, into whose care she was discharged, about what activities [J.V.] should avoid so soon after discharge."  As we noted in our introduction, that duty-to-warn theory was not argued to the motion judge by plaintiff's former counsel, and we disregard it. Because plaintiff failed to raise these arguments below, we decline to decide them on appeal.  See Nieder v. Royal Indemn. Ins. Co., 62 N.J. 229, 234 (1973) (holding that appellate courts ordinarily should not reach issues that were not presented below); see also Monek v. Borough of S. River, 354 N.J. Super. 442, 456 (App. Div. 2002).

Dr. Arroyo opined in his expert report and deposition testimony that defendants were negligent in their care as well as their alleged premature discharge of J.V.

As noted in his expert report, Dr. Arroyo reviewed J.V.'s medical records from Barnabas and the triage intake, and transcripts of the depositions of Dr. Ballesteros and APN Ofodikie. Dr. Arroyo did not review, however, the police report of the accident, the recorded statements of J.V., nor the depositions of J.V., plaintiff, and the screening providers, Lassik and Dr. Williams. Even so, it appears from his deposition that Dr. Arroyo at that time was aware of plaintiff's description of the crash and J.V.'s behavior.

In his expert report, Dr. Arroyo concluded:

> It is my position that records show that [J.V.'s] behavior and psychiatric symptoms were not meaningfully improved upon discharge back into the community on September 17th and that it was a deviation from good and accepted practice to change [J.V.'s] medication regimen shortly before discharge and it was also a deviation from good and accepted practice to discharge [J.V.] on September 17th. It is my further opinion that the deviations from good and accepted practice caused the event of [J.V.] resulting in the car accident and injuries to [plaintiff].
>
> [(Emphases added).]

14

Regarding plaintiff's claim of premature discharge, Dr. Arroyo testified at his deposition that, when defendants discharged J.V. on September 17, 2017, there were signs and symptoms that showed she was a danger to herself and others. He asserted:

Q. [Were] there any signs or symptoms that [J.V.] was experiencing that made her a danger to herself or others?

A. Yes. Her psychotic symptoms that were not properly treated at the time, taking into consideration [that her history of] suicide attempts and self-harm starting in her teen years automatically puts her at a bracket that is high risk.

Q. Even being high risk, was there anything on September 17, 2017, with her signs and symptoms, that made her a danger to herself or others?

A. Yes. Her active psychotic symptoms.

Q. And what were the active psychotic symptoms?

A. Paranoia, guardedness, flat affect.

. . . .

Q. Do you have an opinion as to what caused [J.V.] to act in the manner that she did prior to the automobile incident?

A. "Prior," meaning what?

Q. In the seconds leading up to it, in the minutes leading up to it, you know, what was going on with [J.V.] that led to this incident?

A. I don't know.

Q. Was it a medication issue that caused her to act this way?

A. I don't know.

Q. Was she suicidal?

A. I don't know. All I know is that upon discharge, she still had active psychotic symptoms.

. . . .

Q. So as far as your opinion in this case, what is your opinion [of what] happened with [J.V.] that led to this incident occurring?

A. My opinion is that, you know, based on the medical records that I reviewed and my experience in the field, is that [J.V.] was prematurely discharged. Days prior to being discharged there were active medication changes for evident psychiatric symptoms that were actively occurring. There was a plan for an evaluation for long-term care, and when, as a provider, the options are long-term care and you're evaluating for that, the other side of that should not be discharge. Those two things seem to be in polar oppositions. And so I believe that a meaningful factor was her active psychiatric symptoms upon discharge, and her not being back at the baseline that she was for many years that she was able to achieve. She clearly was decompensated, required hospitalization. Upon discharge, that baseline was not achieved.

. . . .

Q. Was the car accident a suicide attempt by [J.V.]?

16

A. I don't know.

Q. Was it an attempted homicide by [J.V.]?

A. I don't know.

Q. Did [plaintiff] notice any psychiatric issues with her sister before letting her drive?

A. I don't know.

. . . .

Q. Do you have any opinion as to whether or not [J.V.] was overmedicated?

A. No, I have no opinion on that.

Q. Were the medications that she was given appropriate?

A. Based on her history and response to medication, yes. And by that I mean the type of medications that she was given were appropriate. The dosages I cannot determine, because I never evaluated the patient.

[(Emphases added).]

Dr. Arroyo further testified that J.V. had not been provided with "proper observation" before her discharge to determine if the recent medication changes were appropriate.

17

The Motion Judge's Summary Judgment Denial

Defendants moved for summary judgment on several grounds. Among other contentions, defendants principally argued they owed no legal duty to plaintiff concerning the care of J.V. preceding the car crash. Relatedly, the motions also sought dismissal of all defendants due to the failure of plaintiff to establish a causal link between any professional negligence and the crash. Defendants further asserted they are immune from liability in this setting pursuant to N.J.S.A. 2A:62A-16. Plaintiff opposed these arguments but agreed to a stipulation of dismissal as to the claims against Dr. Williams.

After hearing argument, the motion judge issued an oral ruling on May 31, 2024, denying the summary judgment motions.[8] In his decision, the judge reasoned that:

> [A]ccording to the plaintiff, and plaintiff's expert, the records show that she had—at the time of her release, she had not been stabilized. She continued to exhibit behavior which made it inadvisable to allow her to be released. That she continued to present a danger to herself and to others.
>
> And the plaintiff['s] contention is there's enough evidence to show that it was predictable, that she could

[8] Perhaps inadvertently, the motion judge denied the previously filed summary judgment motion on behalf of defendant Dr. Williams, for whom a stipulation of dismissal had thereafter been entered. Counsel do not dispute that Dr. Willams is now out of the case.

18                                                                    A-3598-23

suffer another event, which would present a danger not only to herself, but to others. And therefore, the defendants are responsible for this accident, and the ensuing injuries to the plaintiff.

The [c]ourt finds from the paperwork, and—and again, the defendants urge that plaintiff's expert should not be allowed to render these opinions, because he—during his deposition indicated that he had not reviewed the sister's deposition transcript, and the plaintiff's transcript, and—and wasn't aware of the cause of the accident.

The [c]ourt is cognizant of that argument, but the [c]ourt finds that there is enough here in the record to go to a jury. And consequently, the [c]ourt is denying the defendant's motion in all respects.

[(Emphases added).]

Defendants moved for leave to appeal, which we granted by an order limiting the appeal "to the issue of whether appellants owed a duty of care to respondent."

II.

In assessing the arguments about duty implicated by this interlocutory appeal, we apply familiar principles of appellate review. We review the trial court's denial of summary judgment de novo, affording to plaintiff all reasonable inferences of fact from the record. Statewide Ins. Fund v. Star Ins. Co., 253 N.J. 119, 124–25 (2023). Furthermore, because questions of the presence or absence of a legal duty inherently entail issues of law, we likewise assess those issues de

novo.  Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 502 (1997); see

Townsend v. Pierre, 221 N.J. 36, 51 (2015).

A.

As a threshold subject, we first consider defendants' argument that they

owe no enforceable duty to plaintiff because a statute, N.J.S.A. 2A:62A-16,

allegedly immunizes their decision to release J.V. from their psychiatric care.

That claim of immunity is easily dispelled by Supreme Court precedent.

N.J.S.A. 2A:62A-16, enacted in 1991, immunizes licensed mental health

professionals from certain forms of liability arising from the violent acts of their

patients.  The statute provides:

> a. Any person who is licensed in the State of New
> Jersey to practice psychology, psychiatry, medicine,
> nursing, clinical social work, or marriage and family
> therapy, whether or not compensation is received or
> expected, is immune from any civil liability for a
> patient's violent act against another person or against
> himself unless the practitioner has incurred a duty to
> warn and protect the potential victim as set forth in
> subsection b. of this section and fails to discharge that
> duty as set forth in subsection c. of this section.
>
> b. A duty to warn and protect is incurred when the
> following conditions exist:
>
> (1) The patient has communicated to that practitioner a
> threat of imminent, serious physical violence against a
> readily identifiable individual or against himself and
> the   circumstances   are   such   that   a   reasonable

20

professional in the practitioner's area of expertise would believe the patient intended to carry out the threat; or

(2) The circumstances are such that a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out an act of imminent, serious physical violence against a readily identifiable individual or against himself.

A duty to warn and protect shall not be incurred when a qualified terminally ill patient requests medication that the patient may choose to self-administer in accordance with the provisions of P.L. 2019, c. 59 (C. 26:16-1 et al.).

c. A licensed practitioner of psychology, psychiatry, medicine, nursing, clinical social work, or marriage and family therapy shall discharge the duty to warn and protect as set forth in subsection b. of this section by doing one or more of the following:

(1) Arranging for the patient to be admitted voluntarily to a psychiatric unit of a general hospital, a short-term care facility, a special psychiatric hospital, or a psychiatric facility, under the provisions of P.L. 1987, c. 116 (C. 30:4-27.1 et seq.);

(2) Initiating procedures for involuntary commitment to treatment of the patient to an outpatient treatment provider, a short-term care facility, a special psychiatric hospital, or a psychiatric facility, under the provisions of P.L. 1987, c. 116 (C. 30:4-27.1 et seq.);

(3) Advising a local law enforcement authority of the patient's threat and the identity of the intended victim;

(4) Warning the intended victim of the threat, or, in the case of an intended victim who is under the age of 18, warning the parent or guardian of the intended victim; or

(5) If the patient is under the age of 18 and threatens to commit suicide or bodily injury upon himself, warning the parent or guardian of the patient.

d. A practitioner who is licensed in the State of New Jersey to practice psychology, psychiatry, medicine, nursing, clinical social work, or marriage and family therapy who, in complying with subsection c. of this section, discloses a privileged communication, is immune from civil liability in regard to that disclosure.

[N.J.S.A. 2A:62A-16.]

This statute is of no avail to defendants in the particular context of this litigation. That is because in Marshall v. Klebanov, 188 N.J. 23, 38 (2006), the Supreme Court held "the statutory immunity provisions of N.J.S.A. 2A:62A-16 do not immunize a mental health practitioner from potential liability if the practitioner abandons a seriously depressed patient and fails to treat the patient in accordance with accepted standards of care in the field." The Court further elaborated that "[i]f a physician deviates from the applicable standard of care in the treatment of a patient and that deviation proximately causes harm to the patient, then the physician is liable for damages caused by his or her professional negligence." Id. at 34.

Quite simply, Marshall instructs that the statutory immunity of N.J.S.A. 2A:62A-16 does not apply to negligence allegations for breaching professional standards of care. Here, in his report and deposition testimony, plaintiff's medical expert Dr. Arroyo repeatedly asserted that Barnabas and its mental health professionals breached the standards of care of their respective occupations in their treatment and discharge of their patient J.V.

We recognize defendants criticize the opinions of Dr. Arroyo and contend that, to the contrary, they adhered to all pertinent standards of care. Nonetheless, the immunity statute, as construed by the Court in Marshall, does not insulate such alleged breaches. Viewing the record, as we must, in a light most favorable to plaintiff, defendants were not protected by the statutory immunity.

### B.

Immunity aside, more complex questions of law are posed by plaintiff's specific contention that defendants owed plaintiff, as the passenger in J.V.'s car, a duty to protect her from harm that allegedly could have been avoided if defendants had not discharged J.V. on September 17, 2017.

The presence or absence of a legal duty under New Jersey negligence law involves multiple factors. "Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of

23

basic fairness under all of the circumstances in light of considerations of public policy." Holm v. Purdy, 252 N.J. 384, 402 (2022) (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)). To determine whether an actionable duty exists, a court weighs "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Hopkins, 132 N.J. at 439; see Coleman v. Martinez, 247 N.J. 319, 352–54 (2021) (applying the Hopkins factors).

The Hopkins four-factor analysis of duty arises here in the discrete context of harm caused to a third party by a mental health professional's patient. "New Jersey courts have recognized a mental-health professional owes a duty to take reasonable steps to protect a readily identifiable victim put at risk by their patient." Vizzoni v. B.M.D., 459 N.J. Super. 554, 570 (App. Div. 2019); see also McIntosh v. Milano, 168 N.J. Super. 466, 489 (Law. Div. 1979) (holding that a therapist had a duty to protect a readily identifiable victim who was murdered by his patient because the therapist had reason to know his patient presented a clear danger to the victim); accord Tarasoff v. Regents of Univ. of Cal., 551 P.2d 334, 353 (1976) (holding under California law that a psychiatrist had a duty to protect a readily identifiable victim of his patient when the patient informed the psychiatrist of his intent to murder the victim).

A-3598-23

Our decision in <u>Vizzoni</u>, 459 N.J. Super. at 554, provides useful guidance in addressing the issue of duty in this case. In <u>Vizzoni</u>, the executor of the estate of the victim, a pedestrian, sued the psychiatrist of the driver who had hit and killed her, alleging the psychiatrist's negligent prescription of medication to the driver was the proximate cause of the collision. <u>Id.</u> at 560. The plaintiff's expert opined that the psychiatrist's treatment of the driver fell outside the acceptable professional standards of care and that deviation was a significant contributing factor in causing the motor vehicle collision. <u>Id.</u> at 565. The trial judge rejected that theory of liability, ruling that "because there was no connection between [the victim] and [the psychiatrist], [the psychiatrist] did not owe her a duty of care" and granted the defendant's motion for summary judgment. <u>Ibid.</u>

On review in <u>Vizzoni</u>, we affirmed the summary judgment dismissal of the plaintiff's complaint. We explained that, although the psychiatrist had a duty to exercise reasonable care in his treatment of the patient, the doctor "can only be held liable <u>for the foreseeable consequences</u> of his actions." <u>Id.</u> at 574 (emphasis added). Although the plaintiff's expert in <u>Vizzoni</u> had opined that the medication the patient had taken compromised her ability to drive, we concluded "the record lacks any evidence [the driver] was experiencing one or several of these side effects, during or after the fatal crash." <u>Id.</u> at 579. We therefore

25

affirmed "the trial court's dismissal of plaintiff's claim as a matter of law, because no reasonable jury could find, based on the proofs submitted, the medication [the psychiatrist] prescribed caused [the driver] to strike [the victim] with her car." Id. at 580.

Here, the record fails to substantiate that this one-car motor vehicle crash would have been reasonably foreseeable to defendants. The multiple professionals who evaluated J.V. at Barnabas before she was discharged found she was ready to—and desired to—go home. The assessments reported that she was not currently suicidal or homicidal. As we noted above, her demeanor appeared by that point to be calm and rational. There is no evidence that she was engaging in the sort of "growling" or other odd behavior allegedly observed by plaintiff when J.V. was driving the car on September 18, 2017. Although J.V.'s prescriptions had been adjusted during her seventeen-day stay, the record does not reflect those medications, as adjusted, were ineffective nor that those medications had side effects consistent with J.V.'s alleged behaviors directly prior to the car crash.

Notably, plaintiff's expert was unable at his deposition to explain why J.V. had driven the car off the road. J.V. herself provided no consistent narrative of what had occurred. She had evidently driven her car competently to multiple

26

destinations the preceding day. According to plaintiff, prior to the September 18, 2017 crash, J.V. had not been in any motor vehicle accidents for about forty years. The crash appears to have been a spontaneous occurrence.

We recognize that, as described in her deposition, the handwritten note sent to Lassik from an unidentified source stated that J.V. was symptomatic and that she should be considered for potential long-term care. But Lassik and Dr. Williams each disagreed after evaluating J.V., and concluded she was not eligible for involuntary commitment. We are also cognizant that plaintiff's expert, who never examined J.V., opined that defendants should have held J.V. longer. But even if reasonable minds might disagree as to whether J.V. was suitable for discharge, the record is bereft of evidence that the September 18, 2017 car crash was reasonably foreseeable to J.V.'s providers. Breach or no breach, the injury must have been reasonably foreseeable to support liability.

In sum, there simply is no basis here to infer that this motor vehicle crash could reasonably have been foreseen by defendants when they discharged J.V. from their facility. See Carvalho v. Toll Bros. & Devs., 143 N.J. 565, 572–73 (1996) (describing foreseeability as a "crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate"); see also Olivo v. Owens-Illinois, Inc., 186 N.J. 394, 402 (2006) (same).

A-3598-23

Given the absence of this critical element of foreseeability, we discern no grounds to impose a legal duty upon these defendants to protect third parties such as plaintiff who could have been passengers injured in a vehicle driven by J.V. after her discharge. The sibling "relationship of the parties" did not make the crash foreseeable. Nor did the "nature of the risk" or the "opportunity and ability to exercise care." Hopkins, 132 N.J. at 439.[9]

Lastly, the fourth Hopkins factor of "the public interest" weighs against the imposition of a duty to confine J.V., a voluntary patient, in the facility against her wishes. Our civil commitment laws, in fact, run contrary to plaintiff's theory of "premature discharge" liability.

By statute, patients receiving treatment in a short-term care facility in New Jersey have the right to "the least restrictive conditions necessary to achieve the purposes of treatment." N.J.S.A. 30:4-27.11d(b)(2). In furtherance of that "least restrictive" principle, N.J.S.A. 30:4-27.20 codifies strict rules regulating the discharge of voluntary patients such as J.V., declaring:

> A voluntary patient at a short-term care or psychiatric facility or special psychiatric hospital <u>shall be discharged by the treatment team at the patient's</u>

---

[9] We decline to address defendants' suggestion that plaintiff was comparatively at fault in deciding to be a passenger in a car driven by her sister, a person recently discharged from a psychiatric facility. Questions of duty logically precede such comparative fault issues.

request.  The treatment team shall document all requests for discharge, whether oral or written, in the patient's clinical record.  The facility shall discharge the patient as soon as possible but in every case within 48 hours or at the end of the next working day from the time of the request, whichever is longer, except that if the treatment team determines that the patient needs involuntary commitment, the treatment team shall initiate court proceedings pursuant to section 10 of this act.  The facility shall detain the patient beyond 48 hours or the end of the next working day from the time of the request for discharge, only if the court has issued a temporary court order.

[(Emphases added).]

To determine whether a patient requires involuntary commitment, a screening service may undertake an assessment "to determine what mental health [or other professional] services are appropriate for the person and where those services may be most appropriately provided in the least restrictive environment."  N.J.S.A. 30:4-27.5(a).  If the screener finds that the criteria for involuntary commitment have been met, the screener shall provide a screening assessment document to a psychiatrist, and if that psychiatrist agrees involuntary commitment is necessary, that expert will complete a screening certificate, in which the screening staff and psychiatrist work together to determine the least restrictive environment for treatment (outpatient or inpatient) and make subsequent treatment plans.  N.J.S.A. 30:4-27.5(b).  If, conversely, the screener

29

determines the patient is not in need of involuntary commitment, then the screener shall determine appropriate community resources for the patient. N.J.S.A. 30:4-27.5(c).

N.J.S.A. 30:4-27 dictates the requirements for involuntary commitment. The statute requires proof the patient is dangerous to oneself or others in the "reasonably foreseeable" future:

> "In need of involuntary commitment" or "in need of involuntary commitment to treatment" means an adult with mental illness, whose mental illness causes the person to be <u>dangerous to self or dangerous to others</u> or property and who is unwilling to accept appropriate treatment voluntarily after it has been offered, needs outpatient treatment or inpatient care at a short-term care or psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the person's mental health care needs.
>
> . . . .
>
> "<u>Dangerous to self</u>" means that by reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate that the person is unable to satisfy his need for nourishment, essential medical care or shelter, so that it is <u>probable that substantial bodily injury, serious physical harm, or death will result within the reasonably foreseeable future</u>; however, no person shall be deemed to be unable to satisfy his need for nourishment, essential medical care, or shelter if he is able to satisfy such needs with the supervision and assistance of others who are willing and available. This determination shall take into account a person's history,

A-3598-23

recent behavior, and any recent act, threat, or serious psychiatric deterioration.

"Dangerous to others or property" means that by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future. This determination shall take into account a person's history, recent behavior, and any recent act, threat, or serious psychiatric deterioration.

[N.J.S.A. 30:4-27.2(h), (i), (m) (emphases added).]

Consistent with these principles, we have held that the potential dangers arising from the prospect that a patient "may stop taking [her] medications . . . [and] [her] mental status [may] exacerbate and [she] may return to the hospital" is not sufficient to support a finding the patient is "dangerous" and requires involuntary commitment. In re Commitment of J.R., 390 N.J. Super. 523, 531–32 (App. Div. 2007) (second and fourth alteration in original).

Plaintiff's theory of premature discharge in this lawsuit runs counter to these statutory requirements that are designed to honor a patient's liberty and autonomy. If we were to affirm the trial court's decision, that ruling could undermine the public interest that is codified by our civil commitment laws.

Here, the hospital and its staff followed the statutory protocol by having Lassik and Dr. Williams make a formal assessment of J.V.'s suitability for

discharge. The two screening providers duly concluded that there were no grounds to commit J.V. at that point involuntarily. Although plaintiff's expert disputes that medical assessment of J.V.'s stability for discharge, imposing tort liability based on such a retrospective critique could result in hospitals confining voluntary-admission patients longer and more frequently than our civil commitment laws allow.

In making these observations, we recognize the possibility that a mental health care facility or screening professional might act negligently in concluding that a patient does not meet the criteria for involuntary commitment and thus should be discharged. That possibility, however, does not justify the imposition of a duty on the facts of this case. As we have emphasized, Lassik and the other professionals who assessed J.V. before her release all concluded that she appeared to be stable at that time. They did not detect current signs or symptoms sufficient to meet the criteria for commitment. To be sure, mere procedural adherence to the screening protocol should not preclude liability for conducting that protocol in a negligent manner beneath professional standards of care. But even if such negligence were proven, the post-discharge harm the patient caused to a third party must have been reasonably foreseeable. In this case, it was not.

A-3598-23

Hence, applying the multi-factor <u>Hopkins</u> test, we conclude the trial court erred in finding that defendants owed an enforceable legal duty to plaintiff in the circumstances presented. We therefore reverse the denial of summary judgment and order the dismissal of the complaint. In doing so, we are cognizant of the serious injuries plaintiff sustained but are also mindful that she pursued recovery from the driver.

All other points raised on this appeal, insofar as we have not addressed them explicitly, lack sufficient merit to warrant discussion. <u>R.</u> 2:11-3(e)(1)(E).

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3598-23